[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 939 
Dr. Colby Atkins and Children's Hospital of Alabama ("the Hospital") appeal from a judgment entered on a jury verdict awarding the plaintiffs, Charles and Glendon Lee, $6,875,000 in an action alleging the wrongful death of their four-year-old son, Charles Lee, Jr. We affirm.
On July 21, 1985, Charles Lee, Jr., was admitted to the Hospital for treatment of first-degree to third-degree burns covering 40% to 50% of his body, which he had suffered when a fire erupted in a storage room in which he was playing. Primary responsibility for the child's treatment was assigned to Dr. Marshall Pitts and his associate, Dr. Charles Baldwin, who were board-certified pediatric surgeons.
At the time Charles was admitted, the Hospital had an arrangement with the University of Alabama at Birmingham ("UAB") pursuant to which UAB furnished to the Hospital medical students and medical school graduates, who would, as part of their continuing education, work as "residents," i.e., interns, under the supervision of board-certified pediatric surgeons and physicians. Dr. Colby Atkins, who, when *Page 940 
Charles was admitted had been a resident for approximately 28 days, was working under the supervision of Dr. Pitts and Dr. Baldwin.
From his admission on July 21, Charles was routinely treated by residents, including Dr. Atkins. For example, Dr. Hendron, a second-year resident, attended Charles upon his arrival at the emergency room. Soon afterward, chief resident Michael Trotter inserted a "triple-lumen intravenous catheter"[1] into the child's subclavian vein[2] through an incision made at the upper right side of the body. Dr. Hendron replaced the catheter on July 23.
Although from July 21 to July 28 Charles's temperature persistently fluctuated between 99.5 and 102.5 degrees, he showed gradual improvement. Dr. Baldwin testified that the child's recovery was "going very well" and that he was "improving significantly." By July 29, Charles was eating a regular diet, was walking around the room, and was playing with toys in the hallway.
At approximately 3:45 p.m. on July 29, nurse Melanie Taylor discovered that Charles's temperature had risen to 104.5 degrees, and she notified Dr. Atkins. A few minutes later, X-rays were taken. They revealed no abnormalities in the heart or lungs. Also, in order to determine whether the latest temperature increase was the result of an infection, Dr. Atkins ordered the collection of blood and urine samples. Dr. Atkins also ordered an examination of the tip of the intravenous catheter for the presence of infectious organisms.[3] This necessitated removing and replacing the existing catheter. At approximately 5:15 p.m. on July 29, Dr. Atkins, accompanied by nurse Taylor and nurse Cheryl Castner, entered Charles's room to begin the procedure. Mr. and Mrs. Lee, who were present at that time, were asked to leave the room.
When the procedure was concluded, Mr. and Mrs. Lee returned to the room. By 6:00 p.m., Charles's temperature had fallen to 99.4 degrees,[4] and an hour later, he was sitting in his mother's lap drinking a soft drink. At approximately 7:30, after walking to the doorway of his room to watch a child playing in the hall, Charles suffered an apparent seizure and collapsed. A crew of medical personnel, including Dr. Baldwin, was unable to revive the child, and he was pronounced dead at 8:20 p.m.
On April 8, 1986, Glendon and Charles Lee, Sr., sued the Hospital and Drs. Atkins, Baldwin, Pitts, and Trotter, alleging that the defendants had wrongfully caused the death of Charles, and, in an amended complaint filed on June 11, 1987, further alleging that the Hospital had perpetrated a fraud upon Glendon and Charles Lee, Sr., by falsely representing that the child's treatment would be performed by Dr. Pitts or similar "licensed pediatric surgeon[s]."
Following a trial that spanned nearly five weeks, a jury returned a verdict in favor of the Hospital on the fraud claim and a verdict in favor of Dr. Baldwin on the wrongful death claim. It returned a verdict against Dr. Atkins and the Hospital in the amount of $6,875,000 on the wrongful death claims.[5]
Dr. Atkins and the Hospital each filed a motion for a judgment notwithstanding the *Page 941 
verdict, for a new trial, or for a remittitur. After conducting a hearing as required by Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986), to review the defendants' contentions that the verdict was excessive, the trial court denied the defendants' motions.
On appeal, the Hospital insists that the trial court erred in (1) submitting to the jury the plaintiffs' fraud claim against the Hospital. In addition, the Hospital and Dr. Atkins contend that the trial judge erred in (2) admitting or refusing to admit numerous items of evidence; (3) improperly charging the jury; (4) allowing improper argument before the jury; (5) exhibiting judicial bias or misconduct; and (6) overruling the defendants' motions for a J.N.O.V., a new trial, or a remittitur.
 I. FRAUD CLAIM AGAINST THE HOSPITAL
In addition to alleging that the defendants had wrongfully caused the death of their son, Glendon and Charles Lee, Sr., alleged that the Hospital had misrepresented the nature of the care that Charles would receive in order to induce them "to admit their son to the care of the Hospital and to expend great sums of money" in procuring medical care. Their amended complaint further alleged that as a "proximate result of the fraudulent misrepresentations of the Hospital, the plaintiffs unknowingly submitted their son to the care of medical students, unlicensed physicians, and others," and, in addition to incurring expenses for medical care, "suffered great emotional and mental distress and anguish" as a result of Charles's death.
The Hospital argues that "Alabama law provides for one exclusive cause of action for death allegedly caused by the tortious acts or omissions of another"; therefore, it contends, the joinder of the fraud claim with the wrongful death claim and the submission of the fraud claim to the jury mandates reversal of this case. Brief of Children's Hospital, at 39. We disagree.
The fraud claim was tried and submitted to the jury against the Hospital, only. The jury returned a special verdict on forms clearly indicating the claims on which liability rested. Because the jury rejected the plaintiffs' arguments on the fraud claim and returned a verdict in favor of the Hospital on that claim, its submission could not have tainted the verdict on the wrongful death claim, which assessed damages against both defendants in the amount of $6,875,000. See State FarmFire Casualty Co. v. Ponder, 469 So.2d 1262 (Ala. 1985);Russell v. Baccus, 707 F.2d 1289 (11th Cir. 1983); Van Cleef v.Aeroflex Corp., 657 F.2d 1094 (9th Cir. 1981).
Moreover, the evidence introduced in support of the plaintiffs' fraud claim also was material to issues arising under the wrongful death claims, such as the conduct of the defendants in relation to applicable standards of care. SeeSims v. Struthers, 267 Ala. 80, 100 So.2d 23 (1957); C. Gamble,McElroy's Alabama Evidence § 425.01(14) (4th ed. 1991). Thus, assuming, without deciding, that the joinder of the fraud and wrongful death claims and the submission of the fraud claim to the jury constituted error, we are unable to conclude that those errors necessitate a reversal.
 II. EVIDENTIARY RULINGS
In reviewing a trial court's rulings on the admission of evidence, we are guided by two fundamental principles. The first principle is that trial judges are invested with "wide discretion to exclude or admit evidence even of minor probative value on issues litigated in the cases. The test is that the evidence must . . . shed light on the main inquiry, and not withdraw attention from the main inquiry." Ryan v. Acuff,435 So.2d 1244, 1247 (Ala. 1983); see also C. Gamble, McElroy'sAlabama Evidence § 21.01(6) (4th ed. 1991). The second principle is that a judgment cannot be reversed on appeal for an error "unless . . . it should appear that the error complained of has probably injuriously affected substantial rights of the parties." Rule 45, A.R.App.P.; Snow v. Boykin,432 So.2d 1210, 1214 (Ala. 1983); see also American FurnitureGalleries, Inc. v. McWane, Inc., *Page 942 477 So.2d 369 (Ala. 1985); Muncher v. Muncher, 509 So.2d 250
(Ala.Civ.App. 1987). The defendants' excellent briefs enumerate at least seven allegedly erroneous evidentiary rulings. However, after carefully reviewing the record within the framework of these two principles, we conclude that the trial judge's evidentiary rulings do not constitute reversible error.
 III. IMPROPER ARGUMENT
The defendants contend that the closing arguments of the plaintiffs' counsel contained improper references to the "value of life in a wrongful death case, where the exclusive remedy is . . . punitive damages and not compensatory damages." Brief ofColby Atkins, at 48. In this connection, the following discourse appears in the record:
 "[By counsel for the plaintiffs] You are the conscience of the community. The juries in this country . . . have stood up time and time again for principles that sound corny but absolutely are inherent and breathe in each of us, principles of self-determination, principles of individual rights, principles of protection of people when they are weak and unquestionably . . . unique to our society, principles that an individual's life is very valuable.
 "[If a] person [is] lost at sea, the navy doesn't say, 'Oh, gosh. It's going to take $200,000 or $5,000,000 to send out two boats and a bunch of planes.' They send the planes out and they don't look for the downed airplane, they look for the individual. The individual's life is paramount in their search at sea.
 "Those types of values are in our society — perhaps not in all, but in our society — very unique because we understand the potential of an Albert Einstein or the potential of the Jonas Salk to do wondrous things and we cannot underestimate that — the unique qualities of the individual.
 "[By counsel for Dr. Atkins] We object to this form of argument about the 'Einsteins' and so forth, and individuals in a death case.
 "[By the court] Are you through with that language?
 "[By counsel for the plaintiffs] Yes, sir. One of the [examples] of . . . uniqueness, I think, is when you think about art. You know, an individual is a unique character. I didn't . . . know [Charles, who was] four years old, but he sounds like a 'character.' [There is] no question [that] he was unique — all of us are. We have unique. . ..
 "[By counsel for Dr. Atkins] If the court please, again, I object. This is not a proper argument in a death case.
 "[By counsel for the plaintiffs] Your Honor, there are about three cases on that subject; the intrinsic value of life is the proper subject for argument."
(Emphasis added.)
The rationale underlying the Alabama Wrongful Death Act, which allows recovery of punitive damages only, "rests upon the Divine concept that all human life is precious." Estes HealthCare Centers, Inc. v. Bannerman, 411 So.2d 109, 113 (Ala. 1982) (emphasis added). Thus, in argument counsel must distinguish between the value of human life in general, as opposed to the value of a particular life — a distinction that is not always easy to articulate.
References in counsel's argument in this case to the "unique qualities of the individual" blur that distinction. However, subsequent references to the value of human life in general, such as the acknowledgment that "all of us" are unique and the statement regarding the "intrinsic value of life," placed the argument in the proper context and rendered it reasonably susceptible of the proper construction. See Griggs v. Finley,565 So.2d 154 (Ala. 1990); Gray v. Mobile Greyhound Park, Ltd.,370 So.2d 1384 (Ala. 1979).
Furthermore, any confusion on the part of the jury regarding the proper assessment of damages in this case should have been dispelled by the following charge given at the close of the arguments of counsel: *Page 943 
 "In a suit brought for a wrongful act, omission or negligence causing death, the damages recoverable are punitive and not compensatory; damages in this type of action are entirely punitive, imposed for the preservation of human life and as a deterrent to others to prevent similar wrongs.
 "The amount of damages should be directly related to the amount of wrongdoing on the part of the defendant or defendants. In assessing damages, you are not to consider the monetary value of the life of the child, for damages in this type of action are not recoverable to compensate the [family] of the deceased from a monetary standpoint on account of his death, nor to compensate the plaintiffs for any financial or pecuniary loss sustained by the family of the deceased on account of his death."
(Emphasis added; substantially quoting Alabama Pattern JuryInstructions § 11.18.)
 IV. JURY CHARGES
The defendants contend that the trial court erred in directing a verdict in favor of Dr. Baldwin on the issue of agency and in subsequently charging the jury that it was not to consider the question whether Dr. Atkins was Dr. Baldwin's
agent. The Hospital insists that these charges by implication charged the jury that Dr. Atkins was the Hospital's agent. Dr. Atkins also contends that by so charging the jury and by giving its instructions on the fraud claim against the Hospital immediately thereafter, the trial court improperly focused the jury's attention on him. We find no merit in these contentions.
Dr. Atkins also contends that the trial court erred in giving the following instruction:
 "If you are reasonably satisfied from the evidence in this case that Dr. Atkins was negligent and [that] his negligence concurred and combined with the negligence of a third person, not a party of this suit, to cause the death of Charles Lee, Jr., that fact would not relieve the defendant, Dr. Atkins, from liability for his own negligence and the plaintiff would be entitled to recover from the defendant."
He insists that "[t]here was no evidence presented at trial that raised an issue of concurring and combining negligence of a third person not a party to the suit." Brief of Colby Atkins, at 54. Consequently, he argues, the instruction was impermissibly abstract. Interestingly, elsewhere he concedes that the case involved issues regarding the quality of care provided by the nursing staff. Id. at 52. Indeed, the record is replete with testimony regarding the conduct of the nurses assigned to Charles relative to standards and procedures governing placement of an intravenous catheter. After careful consideration of the arguments and instructions propounded to the jury in this case, we conclude that they provide no basis for reversal.
 V. JUDICIAL CONDUCT
The defendants contend that questions posed by the trial judge to nurse Taylor, a witness called by the plaintiffs, and remarks made by the judge in response to objections by counsel for the Hospital constituted improper commentary on the evidence. These contentions arise out of the following events:[6]
 "Q. [By Plaintiffs' Counsel] All right. But you did look at the patient in general [on July 29]?
"A. [By nurse Taylor] Yes.
"Q. How did he look to you that day?
"(No response.)
"Q. Do you have any recollection?
"A. Not really, except for my notes.
"Q. All right. Look at your notes, please, ma'am.
". . . .
"Q. Does that refresh your recollection?
"A. Just what they say.
 "Q. Just whatever the notes say? You don't have any independent recollection?
"A. No. *Page 944 
 "Q. But based on what you saw of the child, the child looked good that day when you came to work?
"A. Based on my notes.
 "Q. And do you recall having had any involvement in the treatment of this child before —
"A. No.
"Q. — that afternoon?
"A. No.
 "Q. Do you recall meeting Mr. Charles or Glendon Lee at any time before you undertook the care of their child on the afternoon of July 29, 1985?
"A. No.
 "Q. Do you recall any other contact with that child whatsoever before that time?
"A. No, I don't.
 "Q. Do you have any recollection of your treatment of this child or of this case other than what is in your notes?
"A. Not that I can think of.
 "Q. And at your deposition you had no recollection other than just what was written down in your notes, is that right?
"A. No.
 "Q. And at your deposition when you reviewed your notes, you said that they did not give you any independent recollection, that they didn't refresh your memory and bring anything to light that wasn't in your notes, do you recall that?
"A. Not anything that I can recall.
 "Q. Even reviewing the notes wouldn't make this [come] back to you then or today?
"A. No."
At that point in the proceeding, the trial judge interposed the following question:
 "[The Court] Let me make sure I understand it. Are you saying that you don't have any recollection of this patient whatsoever, and that the only way that you're able to testify is by looking at those notes, and that you can read those notes but you don't have any recollection of anything that went on regarding this particular child?
". . . .
"A. Basically, you know.
 "[The Court] That's the only thing that you remember?
"A. That I can think of right now, uh-huh.
 "[The Court] That's the only thing that you can remember that was ever having seen this child — is that right?
"A. This day?
"[The Court] Any day?
"A. Yes.
". . . .
 "[The Court] I'm just asking you about your recollection, can you remember anything whatsoever in any day during the life of that child while he was there at the hospital, do you remember anything other than the [emergency call] or do you have to look at those notes to be able to testify?
"A. I really need my notes."
After further direct examination, which yielded similar responses from the witness, the following discourse occurred in the presence of the jury:
 "[The Court] Hold on just a second. Ms. Taylor, do you have some problem with testifying or are you, do you, are you being coerced or is there some, do you feel some intimidation or some fear about testifying?
"A. (No response.)
"[The Court] You need to speak out.
 "[By counsel for the Hospital] May I approach the bench, please, sir? She's scared to death.
"[The Court] Well, I'm trying to find out —
"[Counsel for the Hospital] Yeah, that's right.
 "[The Court] I tell you what we need to do, let's give this witness an opportunity to review her notes and recall her at another time, can we do that?
 "[Counsel for the Hospital] Judge, I want to go ahead.
"[The Court] She doesn't seem to know anything.
 "[Counsel for the Hospital] Well, if she doesn't know, she doesn't know.
 "[The Court] Well, I have observed this witness and I don't think that she has *Page 945 
put any thought into what she knows . . . and that's why I tried to ask her if there's some particular problem. If she doesn't know, that's one thing.
 "[Counsel for the Hospital] Well, we want to go ahead if we can, Judge, and get this thing behind us.
"[The Court] Well, I do too.
 "[Counsel for the Hospital] Well, can we not proceed?
 "[The Court] I want to give this witness an opportunity to look at these notes, because, otherwise, we need not call her at all.
". . . .
 "[Counsel for the plaintiffs] We don't mind her having a break and looking at them. We presume that she did look at her deposition, and yesterday in the meeting, but there are only four pages of notes that she made.
 "[Counsel for the Hospital] I have been over all of them with her several times. "[The Court] Let . . . her answer and not you, Mr. Scholl. Is there some problem that you have about testifying in this case? I mean, do you feel like there is some — is there some fear that you have? "A. Well, I'm nervous.
 "[The Court] Well, I'm not talking about nervous, we're all nervous. Is there some particular fear that you have?
"A. No.
 "[The Court] Do you feel that any pressure is being brought on you?
"A. (Shakes head negatively.)
"[Counsel for the Hospital] By whom, your Honor?
 "[The Court] Sir, let me ask these questions —
". . . .
 "[Counsel for the Hospital] But you're implying before the jury that I've done something wrong.
 "[The Court] I'm not implying anything. [To the witness] Is there some force, is there some reason why you're having a problem testifying other than nervousness?
". . . .
"A. There's not.
 "[The Court] There's no other reason? All right. Well, why don't you go back into the witness room and take whatever notes you need and take a look at them and think about these things and then come back out."
(Emphasis added.) Subsequently, counsel for both defendants unsuccessfully moved for a mistrial on the ground that the trial judge's remarks implicated the defendants in improprieties.
A party may not predicate an argument for reversal on "invited error," that is, "error into which he has led or lulled the trial court." Dixie Highway Express, Inc. v.Southern Ry., 286 Ala. 646, 651, 244 So.2d 591, 595 (1971); see also State Farm Mutual Automobile Ins. Co. v. Humphres,293 Ala. 413, 418, 304 So.2d 573, 577 (1974). In this case, any implications of coercion or impropriety were reinforced, if not elicited, by counsel for the Hospital. For example, counsel's initial response to the court's attempt to prod an obviously recalcitrant witness was to state: "She's scared to death," and "Yeah, that's right." These remarks clearly emphasized, if not suggested, the implication of which the Hospital now complains.
Moreover, counsel for the Hospital strenuously objected to the court's proposal that the witness be allowed to "review her notes" and be recalled at a later time. Only in response to these objections and to counsel's insistence that the testimony proceed did the trial judge resume a dialogue with the witness. It was during that colloquy that counsel for the Hospital interjected: "But you're implying before the jury that I'vedone something wrong," thus expressly articulating the inference upon which the Hospital now bases its argument for reversal. Assuming, arguendo, that the court's remarks were a commentary on the evidence, we are compelled to conclude that counsel for the Hospital was primarily responsible for the error.
Although Dr. Atkins makes similar contentions, he has thus far been unable to articulate any particular sense in which he was prejudiced by these remarks. For example, *Page 946 
in his argument before the trial judge, counsel for Dr. Atkins stated:
 "I will again at this juncture make another motion for recusal and mistrial and I state that it's on the basis that the court has made statements in the presence of the jury in regard to a witness on the stand and the testimony of that witness that leaves me in doubt and in a quandary as to just how a jury may interpret it, but . . . from my observation and from common sense, I'm led to believe that there's some possibility that the jury could get some adverse thought even insofar as my client, Dr. Atkins, is concerned, and on that basis, we make a motion at this time for recusal and for a mistrial of this case."
(Emphasis added.)
As these remarks indicate, the "possibility" that the discussion quoted above might adversely affect Dr. Atkins is remote. Unlike Drs. Baldwin and Pitts, whose office was at the Hospital where nurse Taylor worked at the time of trial, Dr. Atkins was employed as a "fellow in cardiovascular surgery" at UAB. Therefore, of the opportunities for improper coercion afforded by the positions of the four defendants at the time of trial, Dr. Atkins's opportunity was the most tenuous. Moreover, the derogation of the testimony of a plaintiff's witness, like that alleged in this case, is, a priori, unlikely to prejudice a defendant.
We will not reverse a judgment "unless . . . the error complained of has probably injuriously affected substantial rights of the parties." Rule 45, A.R.App. P.; Bianco v. Graham,268 Ala. 385, 388, 106 So.2d 655, 657 (1958). The appellant bears the burden of proof on this issue. Roubicek v. Roubicek,246 Ala. 442, 21 So.2d 244 (1945). This standard, which requires more than an allegation of "some possibility that the jury could get some adverse thought," has not been met in this case.
 VI. MOTIONS FOR A NEW TRIAL OR A REMITTITUR
The defendants contend that the jury's verdict was contrary to the weight of the evidence, and, in the alternative, that the amount awarded was so large as to be excessive and thereby violate their constitutional rights to due process. Because our disposition of the latter contention necessarily encompasses the former, we shall examine the facts considered by the jury in light of the due process analysis applied in Pacific MutualLife Insurance Co. v. Haslip, ___ U.S. ___, 111 S.Ct. 1032,113 L.Ed.2d 1 (1991).
In Haslip, the United States Supreme Court expressly approved the use of the following factors routinely employed by this Court in reviewing punitive damages awards alleged to be excessive:
 "(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the 'financial position' of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to taken in mitigation."
Haslip, ___ U.S. at ___, 111 S.Ct. at 1045. See also Green OilCo. v. Hornsby, 539 So.2d 218 (Ala. 1989).
A. Resulting Harm
One of the most hotly contested issues at trial was the cause of death — the evidence focusing primarily on the catheterization procedure performed by Dr. Atkins approximately 90 minutes before the seizure. The plaintiffs sought to contravene the testimony of Dr. Atkins, who insisted that he had safely and successfully "changed" the catheter "over a wire," with *Page 947 
evidence that Dr. Atkins, while effecting a "(new placement" of the intravenous catheter, had punctured the child's heart.
Following the unsuccessful attempt to revive the child, Dr. David Kelly, a pathologist at the Hospital, performed an autopsy. Dr. Kelly's examination of the child's heart revealed a number of abnormalities. Specifically, he found that the pericardial sac, a membrane encasing the heart, was "bulging" with blood. He testified that the blood had entered the pericardial sac, an area normally devoid of blood, through four or five "areas of hemorrhage," which he observed on both the outer and inner surfaces of the right atrium and ventricle of the heart.
In a number of these areas, Dr. Kelly located what he believed to be puncture wounds perforating the heart wall. At the site of at least one of the possible puncture wounds, Dr. Baldwin, who assisted Dr. Kelly in the autopsy, was able to insert a small probe. When inserted through the heart wall, the probe pointed upward toward the tip of the intravenous catheter, which was still positioned inside the superior vena cava at the time of the autopsy. Dr. Kelly concluded that the heart had been pierced from the inside outward during the catheterization procedure. He concluded that blood had escaped through the perforations, filled the pericardial sac, and caused a fatal "cardiac tamponade," that is, an arrest of the natural movement of the heart. Dr. Kelly's testimony was reinforced in many respects by the testimony of the defendants' expert witness, Dr. Caulfield, who also concluded that the heart had been pierced by the catheter a very short time before the child died. Thus, the evidence justified a finding that Dr. Atkins's catheterization procedure had caused the child's death.
B. Degree of Reprehensibility
1. Dr. Atkins
The second crucial factual issue before the jury was whether Dr. Atkins had effected a new placement of the catheter. Throughout the trial, Dr. Atkins insisted that he had merely "changed" the catheter "over a wire," that is, that he had inserted a guidewire through the existing, properly positioned catheter, which he then withdrew, and, after withdrawing the former catheter, had inserted another catheter into the same vein using the guidewire and the length of the former catheter, in conjunction with the location of the sutures that had secured it, as reference points. According to this account, Dr. Atkins merely used the incision made earlier by Dr. Hendron in the child's right side to change the catheter.
Within an hour after the procedure, Dr. Atkins met Dr. Baldwin while Dr. Baldwin was making his evening rounds. At that time, Dr. Atkins told Dr. Baldwin that the catheter had been "changed over a wire," and that the procedure had been accomplished without problems or complications. Dr. Atkins testified that the procedure was accomplished without difficulty in approximately 20 minutes.
In contrast to Dr. Atkins's version, nurse Cheryl Castner testified that Dr. Atkins did not merely change the catheter over a wire, but, rather, that he effected a "new placement" — a more hazardous procedure according to all the witnesses — which required the doctor to introduce a guidewire through a needle into a subclavian vein, probing the vein without the benefit of the former catheter as a reference point, and, ultimately, stopping the tip of the catheter just short of the heart's upper receiving chamber. She described the procedure as a "very difficult, traumatic placement." She recalled that "Dr. Atkins had a very difficult time" inserting the catheter. Nurse Castner estimated that the procedure took approximately one hour,[7] during which Dr. Atkins, whose hands, according to nurse Castner, "were shaking so hard that he was having a hard time feeding [the] catheter and the wire and all of [the] parts together," was successful in inserting the *Page 948 
catheter only after he had made numerous attempts to "push" it into place. Nurse Castner's account of events was corroborated by Dr. Kelly's autopsy report, which indicted that Charles was catheterized on the left side of the body at the time of the autopsy.
These contradictions are significant because of the degree of difficulty of the respective procedures in relation to Dr. Atkins's level of experience and because of the accuracy of the information relayed to Dr. Baldwin. Dr. Atkins testified that before the incident giving rise to this suit, he had never, in a pediatric patient, made an unsupervised catheter placementor changed a catheter over a wire. Dr. Baldwin testified that although a change over a wire was a "very simple procedure," one that a resident could be expected to perform without prior notification of the attending physician, he "would expect Dr. Atkins or any resident" to notify him before undertaking a new placement. (Emphasis added.) Elsewhere, Dr. Baldwin stated: "[I]t would have been my policy that I would want to have been informed about a new placement." He also testified that Dr. Atkins was obligated to inform him regarding difficulties encountered during the procedure. The evidence thus suggested that if the catheterization had not been over a guide-wire, Dr. Atkins not only violated the policy of Charles's attending physician, but also lied to that physician about his conduct.
Dr. Atkins contends that, because Dr. Baldwin by casual observation so easily could have determined which catheterization procedure had been performed, the jury could not reasonably have concluded that he had lied to Dr. Baldwin. We disagree.[8] Under the evidence presented, the jury reasonably could have interpreted Dr. Atkins's conduct as follows: (1) notwithstanding Dr. Baldwin's policies — of which he was, or should have been, aware — Dr. Atkins, for personal reasons, decided to undertake an unsupervised new placement for which he perceived himself to be competent; (2) Dr. Atkins made a new incision on the right side near the pre-existing incision; (3) Dr. Atkins expressly rejected nurse Castner's suggestion that he use a heart monitor[9] and nurse Taylor's suggestions of a post-procedure X-ray[10] because the recordation of such devices on the chart would have indicated to Dr. Baldwin that he had made a new placement; (4) notwithstanding the difficulties that developed, he told Dr. Baldwin that the procedure had gone well in order to prevent further inquiry into the matter;[11] and (5) following the fatal cardiac arrest, he attempted to perpetuate the deception.[12] This interpretation so charges Dr. Atkins with "awareness" of the impropriety of his conduct and with attempts at "concealment" as to weigh heavily in favor of sustaining the judgment of the trial court. Haslip, ___ U.S. at ___,111 S.Ct. at 1045. *Page 949 
2. The Hospital
The record provides ample evidence to support a finding of the Hospital's culpability predicated on its own policies and conduct. James Schmerling, a former associate administrator for operations at the Hospital, testified that the Hospital received no information regarding the capabilities of the residents used pursuant to its agreement with UAB and that the Hospital had no "credentialing process" for those residents. He also stated that the Hospital had no orientation or monitoring procedures for the residents. The jury could have concluded that this evidence indicated a "policy of no policy," which was woefully inadequate to prevent this occurrence and similar occurrences.
Additionally, in its order denying the defendants' post-judgment motions, the trial court observed that counsel for the Hospital had "participated with his client in withholding the name of a material witness." More specifically, the court stated:
 "Following [Dr. Atkins's] testimony, the plaintiffs presented Nurse Cheryl Castner. Her testimony was in clear contradiction of Dr. Atkins. There was evidence from which the jury could find that Children's Hospital had full knowledge of her whereabouts, but intentionally withheld her name from answers to interrogatories ordered by the court. It was undisputed that Ms. Castner had been contacted by the attorney for the defendant, Children's Hospital. The evidence would allow the jury to conclude that the attorney attempted to intimidate her and urged her not to become involved in the case. . . .
". . . .
 "Children's Hospital called as its only witness Mr. Pete VanPelt. He is the Risk Manager at Children's Hospital and was the last witness to testify in the case. The hospital had previously been ordered to answer interrogatories, which called for it to identify hospital employees who treated the Lee child. In response to that order, the hospital listed some 57 names. The request and the answer to this interrogatory were admitted into evidence during Nurse Geraci's testimony ['Geraci' was nurse Castner's former name]. Despite the numerous . . . times Nurse Geraci had been involved in the Lee child's care, her name was not on the list.
 "Mr. VanPelt testified that Nurse Geraci's name had been left off unintentionally because they could not read her name in the chart. In place of her name, the hospital listed the fictitious name of Nurse Cathy Guardanio. When asked to do so on cross-examination, Mr. VanPelt had no problem reading Nurse Geraci's name from the chart, and he readily admitted the hospital had payroll records from which it could have given more detailed information had it chosen to do so. The jury was free to draw the inference from the evidence that the hospital had intentionally withheld Nurse Geraci's name from the list of employees in an effort to preclude the jury from having the benefit of her observations. . . .
". . . .
 "Nurse Castner testified that the attorney for Children's Hospital had contacted her some time before trial and had recommended that she not talk to anyone, that she could not be subpoenaed, and that he was aware nurses did not have a lot of money and was trying to 'protect her.' . . . Without question, if this evidence is believed by the jury, these matters would support a conclusion of reprehensible conduct on behalf of this defendant."
(Emphasis added.) These observations of the trial court are fully supported by the record.
C D. Removal of Profitability and Defendants' FinancialPositions
Post-trial discovery revealed that the Hospital's net assets in 1989 exceeded $40,000,000. Financial statements revealed that the Hospital's operations had produced substantial profits from 1985 to 1989. Dr. James Dearth, the Hospital's chief executive officer and medical director, estimated that the Hospital's net income would, in 1990, exceed $10,000,000. In addition, the Hospital is insured on a nondeductible basis *Page 950 
through the Alabama Hospital Association Trust ("AHAT"), whose investments exceeded $44,000,000 the end of 1989. Dr. Atkins is also insured on a nondeductible basis through the UAB Professional Liability Trust, which has enjoyed substantial profits annually since its inception. Based on this evidence, it scarcely can be contended that the judgment entered in this case exceeds that which is necessary in order to serve the purposes of punitive damages awards.[13]
After a thorough review of the voluminous record and exhibits and the excellent briefs of counsel, and after our analysis of the evidence in the light of Haslip, we are unable to conclude that the trial court erred to reversal in any respect. Consequently, the judgment of the trial court is affirmed.
AFFIRMED.
MADDOX, SHORES, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] A triple-lumen catheter is a flexible tube composed of three separate tubules of assorted diameters. The device not only facilitates the periodic aspiration of blood samples but also permits multiple, simultaneous infusions of medications directly to the heart.
[2] The subclavian veins, one of which is located beneath each collarbone, enter the "superior vena cava," a larger vein, which, in turn, empties into the right atrial cavity — the upper receiving chamber of the heart.
[3] None of the cultures developed from these samples indicated the presence of an infection.
[4] Charles's temperature drop may have resulted from a combination of treatments that were ordered by Dr. Atkins after 3:45 p.m., including Tylenol medication, the use of ice packs and a cooling blanket, and the reduction of room temperature.
[5] The claims against Dr. Trotter were adjudicated in his favor before trial through the entry of a summary judgment and the plaintiffs voluntarily dismissed the claims against Dr. Pitts during the trial.
[6] At the time of the trial, nurse Taylor was still employed by the Hospital.
[7] The significance of the chronological discrepancies lies in the amount of time required to complete the respective procedures. Considerably more time is required to perform a new placement than to change a catheter over a wire.
[8] This contention presupposes that the jury could only have concluded that Dr. Atkins made a new placement on the left
side. The jury could have determined that Dr. Atkins made a new placement on the right side based solely on the testimony of nurse Castner.
[9] Nurse Castner testified that heart monitors were commonly used at the Hospital during new placements. Dr. Baldwin testified that the device, which records the heart's rhythm, could have revealed contact by the catheter with the heart wall. Under these facts, the jury could have concluded that Dr. Atkins's refusal to use a heart monitor played a significant part in Charles's death.
[10] Both Dr. Atkins and Dr. Baldwin testified that post-procedure X-rays should be, and were, routinely ordered following new placements.
[11] The jury could have concluded that this deception directly contributed to the child's death. For example, Dr. Baldwin testified that although cardiac tamponade is a "recognized complication" of intravenous catheterization, its effects can be reversed if detected in time. He also conceded that if he had been alerted to the possibility of complications, he would have increased his "vigilance" for signs of the onset of the malady.
[12] Nurse Castner testified that Dr. Atkins told her the child "had some sort of congenital heart defect and [had] died of a bleeding problem," an allegation Dr. Atkins denied at trial.
[13] The absence of criminal sanctions or other civil awards further militate against a remittitur. See Haslip, ___ U.S. at ___, 111 S.Ct. at 1045.