[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 437 
Keibler-Thompson Corporation appeals from the trial court's denial of its "postjudgment motion for a judgment as a matter of law, motion for a remittitur, and motion for a new trial." Because we conclude that Keibler-Thompson is entitled to a new trial, we reverse and remand.
United States Steel Corporation ("USS") operates a steel plant in Jefferson County. The plant uses a "blast furnace" to make pig iron, which is eventually refined to produce steel. Essentially, iron ore is heated in a blast furnace until it becomes a liquid; the liquid separates into liquid pig iron and "slag," a liquid by-product of the heated iron ore. Once the liquid reaches a certain temperature, USS employees drill the taphole in the furnace to allow the molten metal to flow out of the furnace and into trenches. When the liquid enters the trenches, the slag rises to the top of the molten pig iron. Using a device known as a "slag skimmer," the USS employees then skim the slag from the top so that it can travel down a trench — the "slag runner" — and drain into the slag pit. The molten pig iron travels down the trench for further refinement.
The USS blast furnace has a slag runner and a slag pit on its east side and on its west side. Each side of the furnace contains an identical set of trenches that lead to the corresponding slag pit. Only one side is used at a time; an alternate side is used with each firing of the blast furnace. In order to control the direction in which the slag flows and which slag runner and slag pit is used at a given time, a "sand dam" is placed in an area known as the "Y," the area where the two slag runners intersect and lead either to the west slag pit or the east slag pit.
In order to ensure that the slag flows freely from the blast furnace to the slag pit, USS employees monitor the flow of the slag. Once slag cools, it turns into a solid crusty material that can clog the slag runner. The runners must be cleaned to remove the dried slag that has accumulated.
In September 1990, James F. Steading began working for USS as a "blast furnace keeper." His duties included monitoring the slag runners, making sure that the slag was moving properly through the runners, and changing the sand dams to divert the slag to the appropriate runner. Occasionally, when USS needed him to, Steading would also serve as a team leader in the blast-furnace area. As team leader, Steading directed his fellow USS workers and made sure they were working safely. *Page 438 
In October 1997, USS entered into a contract with Keibler-Thompson under which Keibler-Thompson agreed to provide USS with equipment and labor for cleaning the slag runners. The contract provided that Keibler-Thompson would clean the runners based on USS's scheduling orders. Article 13 of the contract provided that Keibler-Thompson should take all reasonable measures in cleaning the slag runners to prevent injuries not only to its employees but also to any other persons.
On November 16, 1998, Ricky Davis was acting as Steading's team leader. He instructed Steading to move the sand dam so the other slag pit could be used for the next running of the blast furnace. Steading placed a wooden board in the runner to stand on while he changed the sand dam. He climbed onto the board and began to shovel sand. The board on which Steading was standing fell through the crusted slag and reached a layer of molten slag. The molten slag burned Steading's foot and ankle; he suffered second-degree and third-degree burns to that foot and ankle.[1]
After the accident, USS conducted an accident report; that report indicated that Steading had violated safety job procedure BF-00010. According to the report, Steading had failed to put the board on which he was standing on an even surface. The accident report further indicated that the "slag runner arrangement was previously changed at 10:15 [a.m.] on November 15, 1998."
On August 5, 1999, Steading sued Keibler-Thompson and Thomas Kemble, who was employed by Keibler-Thompson as an assistant area manager, alleging negligence and asserting other claims. Specifically, Steading alleged that Keibler-Thompson had contracted with USS to provide and to maintain a reasonably safe workplace for Steading, and that Steading's injury was the result of Kemble and Keibler-Thompson's negligent design and/or maintenance of the premises where Steading worked. On September 24, 1999, Kemble and Keibler-Thompson answered, denying Steading's allegations.
On August 29, 2001, Kemble and Keibler-Thompson moved for a summary judgment. On November 30, 2001, the trial court dismissed Kemble and, on May 5, 2002, granted Keibler-Thompson's motion for a summary judgment as to all the claims other than the negligence claim.
The trial began on September 29, 2003. Steading testified that if he had known that there was molten slag underneath the crusty slag, he would not have stepped into the slag runner that day. Steading testified that part of the slag runner was clean, but that the area around the sand dam, the "Y," was full of debris. Steading testified that, had the entire runner been clean, he would have noticed the molten slag and he would not have stepped into the runner.
Steading testified that it was impossible to put the board on an even surface because there was too much crusty slag in the runner. Steading argues that "if hot slag had been in this runner just 31 hours *Page 439 
prior to [his] getting into the runner to change the dam, then the entire length of the runner should have been filled with dried slag." (Steading's brief, p. 10.) He asserts that a portion of the runner was clean; therefore, he asserts, Keibler-Thompson had cleaned the runner at some point during the 31- to 32-hour period before the accident. Steading further asserts that the area around the sand dam was filled with crusty slag, and he argues, therefore, that Keibler-Thompson had not properly cleaned the entire runner. Keibler-Thompson responds that none of its employees was present at the time of the accident and that it had not performed any duties concerning the operations in the blast furnace in the three and one-half days preceding Steading's accident. Keibler-Thompson also argues that the condition of the runner at the time of Steading's accident was different from its condition when Keibler-Thompson had worked in the area more than three days earlier because the slag runners are alternated daily.
Kemble, who was no longer employed by Keibler-Thompson at the time of the trial, testified that Keibler-Thompson employees worked at the USS plant 24 hours a day. Kemble testified that Keibler-Thompson employees were at the USS plant on November 14, 15, and 16, 1998. Kemble further testified that in November 1998 Keibler-Thompson was solely responsible for cleaning the slag runners.
Mark Fowler, a USS employee who had worked in the blast-furnace area of the plant for over 25 years, testified that Keibler-Thompson was the only entity that cleaned the slag runners at the USS plant. Fowler testified that he was the USS employee who had the most contact with Keibler-Thompson. Fowler testified that he did not generally check on the work performed by Keibler-Thompson employees when he told them to clean the slag runners. Fowler does not remember the job assignment he gave to the Keibler-Thompson employees on November 15 or 16, 1998. Fowler testified that it was Keibler-Thompson's job to clean the entire length of the slag runner and that if Keibler-Thompson employees did not clean the entire length of the slag runner they had improperly cleaned the runner. Fowler testified that failing to clean the entire length of the slag runner posed a safety risk to USS employees whose duties included changing the sand dam.
USS employee and Steading's team leader, Ricky Davis testified that, on the day of Steading's accident, the area around the sand dam was full of debris and that at the time of the accident Keibler-Thompson was cleaning the slag runners about every day or every other day. A third USS employee, James Mosely, testified that slag became encrusted in the runners after every pouring. He testified that the accident report on Steading's accident indicated that at the time of the accident the area of the runner near the sand dam contained rubble.
Keibler-Thompson argued at trial that Steading was contributorily negligent because he had failed to properly probe the slag runner before he stepped into the runner to clean it. Ricky Davis testified that in order to change the sand dam a USS employee would "take a board and put it in the slag runner, stand on it, and then change the dam." Davis testified that he had never probed a runner and that he had never seen or heard of anyone else probing a runner before changing the sand dam. Davis further testified that he had never seen a written USS policy that requires an employee to probe a slag runner before putting the board in the runner to change the sand dam. At trial, Davis read Keibler-Thompson's policy on probing *Page 440 
the runner; he testified that the probing applies to preparing the runner for a new pouring, not to changing the sand dam.
Steading requested a jury charge on combined and concurring negligence. Over Keibler-Thompson's objection, the trial court gave the requested charge. At the close of Steading's evidence and at the close of all the evidence, Keibler-Thompson moved for a judgment as a matter of law. The trial court denied both motions. On October 6, 2003, the jury returned a verdict in favor of Steading and awarded him $500,000 in compensatory damages.
On November 5, 2003, Keibler-Thompson moved for a judgment as a matter of law, or, in the alternative, a remittitur or a new trial. On February 3, 2004, the trial court denied Keibler-Thompson's postjudgment motion. Keibler-Thompson appeals.
Keibler-Thompson argues: (1) that the trial court erred in denying its motion for a new trial, the ground for which was that a juror who was not properly qualified served on the jury; (2) that the trial court erred when it instructed the jury on combined and concurring negligence; (3) that the trial court erred when it allowed Steading's negligence claim to be submitted to the jury over Keibler-Thompson's motion for a judgment as a matter of law because (a) Keibler-Thompson did not owe Steading a duty or, if it did, it did not breach the duty, (b) Steading was contributorily negligent as a matter of law, and (c) Steading failed to offer expert testimony in support of his negligence claim; (4) that the trial court erred in denying Keibler-Thompson's motion for a summary judgment on Steading's negligence claim; and (5) that the jury's damages award in the amount of $500,000 was excessive.
"The decision to grant or to deny a motion for a new trial rests within the sound discretion of the trial court." Bowers v.Wal-Mart Stores, Inc., 827 So.2d 63, 73 (Ala. 2001); Hill v.Cherry, 379 So.2d 590 (Ala. 1980). "A denial of a motion for a new trial strengthens the presumption of correctness afforded a jury verdict." Bowers, 827 So.2d at 73. This Court will not disturb the decision of the trial court "unless the verdict is against the preponderance of the evidence or is clearly wrong or unjust." Bowers, 827 So.2d at 73.
In reviewing a trial court's ruling on a motion for a judgment as a matter of law, we apply the same standard the trial court applied initially in granting or denying the motion. Palm HarborHomes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). The nonmovant must present substantial evidence to withstand a motion for a judgment as a matter of law. Palm Harbor Homes; West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). When reviewing a ruling on a motion for a judgment as a matter of law, this Court views the evidence in the light most favorable to the nonmovant, entertaining any reasonable inferences that the jury would have been free to draw. Carter v. Henderson,598 So.2d 1350 (Ala. 1992). This Court indulges no presumption of correctness as to the trial court's rulings on questions of law.Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992).
Keibler-Thompson argues that juror no. 138 was not a resident of the area known as the Bessemer Cutoff in Jefferson County at the time of the trial and that she was therefore not qualified to sit on a jury in the Bessemer Division of Jefferson County. Keibler-Thompson alleges that, during voir dire, the trial court asked the jury pool, "Is there anyone here who is not a citizen of the United States or a resident citizen of the Bessemer Cut-off in Jefferson County for more than 12 months?" *Page 441 
Keibler-Thompson alleges that, although the Alabama judicial system jury roles indicated that juror no. 138 resided at 2644 Novel Drive, Bessemer, Al 35023, she did not reside at that address; her correct address is 185 Marina Road, Adger, Alabama. Adger is in Jefferson County; however, juror no. 138's house is located in Walker County. Keibler-Thompson argues that juror no. 138 failed to respond to the trial court's specific question asking whether anyone was not a citizen of the Bessemer Cutoff and that Keibler-Thompson's counsel had relied on her failure to respond. Thus, Keibler-Thompson argues, a new trial is mandated in this case. See Noble Trucking Co. v. Payne, 664 So.2d 202
(Ala. 1995) (holding that a new trial is mandated where a juror fails to respond to a specific question based upon a statutory qualification).
After the trial, Keibler-Thompson moved for a new trial and alleged that after the trial had ended it learned that juror no. 138 did not reside in the Bessemer Cutoff area.[2] In response, Steading submitted an affidavit from juror no. 138. That affidavit stated, in pertinent part:
 "I currently reside at 185 Marina Road, Adger, Alabama, 35006. The City of Adger is located in Jefferson County, Alabama. My mailing address is a Jefferson County/Bessemer Division mailing address. My actual house, however, is physically located in Walker County. I live on the Jefferson/Walker county line. I have lived at this mailing address for approximately 14 years.
 "Since I have lived at this address, including the Steading case, I have served on two separate juries in Jefferson County/Bessemer Division. The first trial was about 5 years before the Steading trial. When I reported to jury duty on the Monday of the Steading trial, I brought my juror card with me and turned it in to the court officials. I wrote my proper address on the card.
 "During juror organization and qualification by the Court officials, the question was asked about whether or not jurors who lived on the county line were properly qualified. The Court officials stated that jurors were selected from driver's license rolls and qualification was based upon your address as it is listed on your driver's license. My address on my driver's license is my mailing address and is a Jefferson County address. Based upon this answer given by the court official, I believed that I was properly qualified for jury service. The Steading trial is now the second time that I had been qualified in this manner for jury service in Jefferson County/Bessemer Division."
Alabama Code 1975, § 12-16-60(a)(1), requires that for more than 12 months before the start of the trial a prospective juror be a resident of the county in which the juror is being asked to serve. In order to serve as a juror in a trial pending in the Bessemer Cutoff area of Jefferson County, a prospective juror must have resided in the Bessemer Cutoff area of Jefferson County for more than 12 months before the start of the trial. SeeGeneral Motors Corp. v. Hopper, 681 So.2d 1373 (Ala. 1996). The requirements of § 12-16-60 are mandatory; the juror qualifications are not within the trial court's discretion.McBride v. Sheppard, 624 So.2d 1069, 1071 (Ala. 1993).
In McBride, the appellants argued that the trial court had erred in denying their motion for a new trial in which they argued that a juror was not qualified to sit *Page 442 
on the jury under § 12-16-60(a)(2), Ala. Code 1975 (requiring a juror to be able to read instructions given by the judge). This Court noted that it had held in Chrysler Credit Corp. v.McKinney, 456 So.2d 1069 (Ala. 1984), "that a new trial was required where the prospective jury venire was specifically asked whether each member could read and write the English language and each member indicated by silence that he or she could."624 So.2d at 1072. However, in McBride this Court noted that the record did not indicate that the prospective juror was specifically asked whether he could read or write the English language; instead, the juror had indicated by his silence that he could. Because the record did not indicate that counsel for the McBrides had specifically questioned the prospective juror about his ability to read the English language and the record also did not indicate that counsel was concerned about the educational background of the prospective jurors, this Court affirmed the trial court's order denying the motion for a new trial.624 So.2d at 1072. See also Holland v. Brandenberg, 627 So.2d 867, 870
(Ala. 1993) ("Failure to use due diligence in testing jurors as to qualifications or grounds of challenge is an effective waiver of grounds of challenge; a defendant cannot sit back and invite error based on juror disqualification.").
In Noble Trucking, cited by Keibler-Thompson as support for its argument that a new trial is warranted here, the appellant, Payne, learned that a juror's voting rights had not been restored and that the juror was therefore disqualified under § 12-16-60, Ala. Code 1975. 664 So.2d at 202. Noble Trucking argued that Payne's attorney did not ask the prospective jurors whether any of them had committed a felony and, if so, whether their voting rights had been restored; thus, it argued, Payne had waived any right to complain on the basis of a juror's disqualification. This Court upheld the trial court's order granting a new trial and, in doing so, distinguished Holland and McBride.664 So.2d at 203-04. In Noble Trucking, we stated that "[i]nHolland and McBride the trial court did not conduct open voir dire in the presence of the defendant's attorney, and the attorneys failed to conduct their own voir dire to ask the jurors about their qualifications." 664 So.2d at 204. However, we noted, in Noble Trucking, "the trial court specifically asked the prospective jurors, in the presence of Payne's counsel, whether any of them were convicted felons whose voting rights had not been restored, and Holland remained silent." 664 So.2d at 204. We concluded that Payne and her attorney had a right to rely on the juror's response to the trial court's question regarding his qualifications as a juror. Id. Moreover, we noted that due diligence regarding a juror's qualifications does not require counsel to conduct voir dire examination that would be repetitious of the voir dire examination already conducted by the court. Id. See also Lollar v. State, 422 So.2d 809
(Ala.Crim.App. 1982); Slay v. State, 338 So.2d 3 (Ala.Crim.App. 1976).[3]
Steading, citing Parish v. State, 480 So.2d 29, 31
(Ala.Crim.App. 1985), and Huckabaa v. State, 475 So.2d 891
(Ala.Crim.App. 1985), argues that in order to *Page 443 
establish the need for a new trial based on a prospective juror's failure to respond properly to a question regarding his or her qualifications, Keibler-Thompson must establish that its rights were probably prejudiced by the juror's failure to respond to the question. However, Steading's argument is misplaced, becauseParish and Huckabaa do not address juror qualifications enumerated in § 12-16-60, Ala. Code 1975. Parish dealt with a juror's failure to disclose her possible acquaintance with defense counsel, and Huckabaa dealt with challenges of jurors for cause under § 12-16-150, Ala. Code 1975. See Chrysler CreditCorp. v. McKinney, 456 So.2d 1069, 1071 (Ala. 1984). Juror no. 138 was disqualified because she did not meet the mandatory requirements of § 12-16-60(a)(1), and Keibler-Thompson was misled by juror no. 138's failure to respond to the question regarding residency.
Steading also argues that before trial juror no. 138 discussed her residency with court officials and that she reasonably believed that she was properly qualified to serve on the jury. However, the fact that juror no. 138 thought she was qualified to serve on the jury does not satisfy the requirement of §12-16-60(a)(1) that she have resided in the Bessemer Cutoff Area of Jefferson County for 12 months preceding the trial. Indeed, juror no. 138 stated in her affidavit that she resided in Walker County. The trial court did not have discretion to determine that, because juror no. 138 believed she was qualified to serve on the jury, she was so qualified. See McBride,624 So.2d at 1071. Thus, the trial court erred in denying Keibler-Thompson's motion for a new trial on the basis that one of the jurors in the case was not qualified to sit on the jury.
Keibler-Thompson's second allegation of error is that, based on the facts of this case, the trial court's charging the jury on combined and concurring negligence, over Keibler-Thompson's objections, was improper because it confused the jury. This Court stated in General Motors Corp. v. Edwards, 482 So.2d 1176, 1195
(Ala. 1985), that "[t]he basic premise of concurrent tortfeasor law is that . . . an injury may have several concurrent proximate causes, including the actions of two or more tortfeasors, neither of whose action was sufficient in and of itself to produce injury, who act, either together or independently to produce it" (citation omitted). Keibler-Thompson argues that because Steading did not present evidence at trial indicating that a third party was also negligent, such a jury instruction was improper. SeeJones v. General Motors Corp., 557 So.2d 1259 (Ala. 1990). Keibler-Thompson argues that it was the sole defendant at trial and that there was no third party with which Keibler-Thompson's actions could have combined or concurred to create the negligence Steading alleges occurred.
In response, Steading argues that he did present at trial evidence of negligence on the part of USS. Steading cites testimony to the effect that the USS plant is a dangerous place to work. (Steading's brief, p. 38.) Specifically, Steading cites Thomas Kemble's testimony: "You know, there was a lot of people that get hurt at [USS] because it is a very dangerous place to work. Some of their own people got hurt out there." Steading also cites testimony from Ricky Davis that it is dangerous for employees to stand in the runners. However, the fact that a workplace is dangerous does not amount to negligence on the part of the employer.
Rule 45, Ala. R.App. P., provides that an appellate court may not reverse a judgment of the trial court on the ground that the jury was misdirected "unless in the opinion of the court to which the appeal is *Page 444 
taken . . . it should appear that the error complained of has probably injuriously affected the substantial rights of the parties." Keibler-Thompson argues that the trial court's instruction on combined and concurring negligence confused the jury to the point that it was unable to decipher the applicable law in this case.
At trial, Keibler-Thompson objected to the instruction on combined and concurring negligence, arguing that such an instruction was improper based on the facts of the case. Nevertheless, the trial court instructed the jury as follows:
 "The negligence of two or more persons may concur and combine to proximately cause injuries and damage. Causes concur and combine when they join together to produce a given result. If you are reasonably satisfied from the evidence in this case that [Keibler-Thompson] was negligent and that [Keibler-Thompson's] negligence concurred and combined with the negligence of a third person, not a party to the suit, to proximately cause the injuries and damage claimed by [Steading], that fact would not relieve [Keibler-Thompson] from liability for his own negligence and [Steading] would be entitled to recover from [Keibler-Thompson].
 ". . . .
 "In lawsuits such as this, all persons are jointly and severally liable for the proximate results of their negligence. The proximate cause of an injury is that cause which in the natural and probable sequence of events and without the intervention of any new or independent cause produces injury and without which such injury would not have concurred.
 ". . . .
 "If one is guilty of negligence which concurs or combines with negligence of another, and the two combine to produce injury or damage, each negligent person is liable for the resulting injury or damage and the negligence of each will be deemed the proximate cause of the injury."
Keibler-Thompson again objected to the trial court's giving the instruction.
Keibler-Thompson argues that the trial court's instruction on combined and concurring negligence "confused the jurors to the point that they were unable to accurately and correctly apply Alabama law." (Keibler-Thompson's brief, p. 28.) Keibler-Thompson argues that the jurors' confusion was evident from the questions the jury submitted to the trial court after it had given the instructions. The jury first requested that the trial court "[e]xplain the law of the 3rd party situation." The trial court responded, recharging the jury with the combined-and-concurring-negligence instruction. Thereafter, a juror requested from the trial court a copy of all of the charges, but the trial court refused to give the jury a written copy of the charges.
On the second day of deliberations, the jury asked the trial court, "If we feel that [USS] was at fault, does the law say we must rule against [Keibler-Thompson]?" The trial court stated that it was going to tell the jury to remember the charge. Keibler-Thompson objected to that approach, but the trial court responded:
 "THE COURT: All right. I charged y'all yesterday on the entire charge. I came back and charged y'all on a particular area of the charge. I want y'all to remember the entire charge. And then I want y'all to remember the particular area that I charged you on, and use those things to help you in your deliberations. If after that you have a particular question about my charge, if you will write it down. Then I can answer that question. Okay. All right." *Page 445 
It appears from the exchange between the trial court and the jurors that the jurors were confused as to the law on combined and concurring negligence. The question posed by the jury — "If we feel that [USS] was at fault, does the law say we must rule against [Keibler-Thompson]?" — suggests that the jury questioned whether Keibler-Thompson was at fault at all. It does not appear that a combined-and-concurring-negligence instruction was proper in this case, and it appears that the instruction injuriously affected Keibler-Thompson.
Steading argues that Atkins v. Lee, 603 So.2d 937 (Ala. 1992), supports his position that the instruction on combined and concurring negligence was proper. In Atkins, the plaintiff alleged that the defendant physician's negligence combined and concurred with the negligence of the hospital's nursing staff to cause the plaintiff's injuries. In concluding that the combined-and-concurring-negligence instruction was proper, the court stated that the "record was replete with testimony regarding the conduct of the nurses assigned to [the plaintiff]."603 So.2d at 943. In this case, Steading cites only the testimony that USS was a dangerous place to work; he does not cite any evidence that suggests that USS committed a negligent act that caused or contributed to his injury. See Caudle v. BirminghamElec. Co., 247 Ala. 34, 39, 22 So.2d 417, 420 (1945) ("The court will not be put in error where it states the law correctly but fails to instruct the jury upon a contention that some of the evidence may tend to support.").
We hold that it was error for the trial court to deny Keibler-Thompson's motion for a new trial. Under §12-16-60(a)(1), juror no. 138 was not qualified to serve on the jury; moreover, the trial court erred when it instructed the jury on combined and concurring negligence. Therefore, we remand this case for a new trial. Because we are reversing based on these two issues and remanding the case for a new trial, we need not discuss the remaining issues Keibler-Thompson raises on appeal.
REVERSED AND REMANDED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] Dr. Alan Dimick, Steading's treating physician, testified that a second-degree burn is very painful because it removes the outer layer of the skin, and as the blister that forms over the area opens, raw nerve endings are exposed. He stated that a third-degree burn requires skin grafting, and that Steading's newly grafted skin will be prone to dryness and irritation. In his opinion, Steading will suffer from "sharp pressure" in that foot for the rest of his life, requiring Steading to wear some kind of special shoe, padding, or protection. Steading's wife testified that Steading's ankle is often swollen and stiff, that his foot tends to crack and bleed, and that it causes problems after he has worked at the USS plant all day.
[2] Steading does not argue that Keibler-Thompson did not act with due diligence in discovering juror no. 138's alleged disqualification.
[3] In Beasley v. State, the Court of Appeals recognized that the appellant's counsel and the court were misled by the juror's failure to respond. 39 Ala.App. 182, 96 So.2d 693 (1957). The court stated, "As to due diligence, we consider that a defendant is not required to search the records of all the courts of this State and of its municipalities running back to the time when the oldest venireman became 14 years of age." 39 Ala.App. at 189,96 So.2d at 700.