DONALDSON, Judge.
This is an appeal by a landlord from a judgment entered in accordance with a jury verdict awarding damages to the landlord against a tenant for breach of a lease agreement. The landlord contends that the damages award was inadequate *1022 and that it is therefore entitled to a new trial. We agree, and we reverse the judgment and remand the cause for a new trial.

Facts and Procedural History

The landlord, 412 South Court Street, LLC (“Court Street”), is a limited liability company controlled by Eugene Sak.[1] The tenant, Alabama Psychiatric Services, P.C. (“APS”), is a professional corporation providing psychiatric medical services to patients in various locations throughout Ala-bama.
The subject matter of the lease agreement is a five-floor multitenant building located at 412 South Court Street in downtown Florence (“the Court Street building”). In 2005, the Court Street building was in a state of disrepair. Among other problems, the air conditioning was broken and only the first and second floors were usable by tenants. In 2005, another limited liability company controlled by Sak, SRS Group, L.L.C., purchased the Court Street building with the goal of renovating and developing it into modern commercial office space that would be custom-built to conform to requests from tenants. Sak also planned to build an atrium addition at the rear of the Court Street building after the initial renovations were completed. As part of the renovation process, demolition on the interior structure of the Court Street building began in the spring of 2006.
In May 2006, Mary Brown, the chief administrative officer of APS, contacted Pro South Realty to inquire about available office space in the Florence area. Pro South Realty was owned by Sak, John Rusevlyan, and another person. Brown spoke with Rusevlyan, a licensed real-es-táte broker and agent, and explained that APS had outgrown the office space it was leasing at that time in Florence (“the Hel-ton Drive office”) and wanted to rent larger office space. Rusevlyan visited the Hel-ton Drive office to assess the needs of APS. After the visit, Rusevlyan suggested that APS consider renting space in the Court Street building. Testimony showed that he told her .that the Court Street building was a multilevel and multitenant building, that it was being renovated, and that the offices would be custom-built to meet the requests of tenants. Rusevlyan ■testified that he also told Brown that Sak was planning to build an atrium addition at the rear of the Court Street building.
Around the same time, Sak or Rusev-lyan began negotiating a lease with Make Believe, LLC, for space in the Court Street building to operate a gym and fitness center, to be known as the Metro Athletic Club (“the MAC”). In August 2006, Make Believe signed a lease to operate the MAC on the first and second floors of the Court Street building.
Soon after the lease with Make Believe was signed, Brown and Sak met at the Court Street building to discuss available space. At that meeting, Sak told Brown that the fourth and fifth floors of the building were already leased, that the first and second floors of the building had been leased to the Make Believe, and that the third floor was the only floor that had available space suitable for APS. Brown testified that she talked to Sak about the possibility that patients of APS might be embarrassed to walk past the MAC to get to the elevator that would take them to the third floor.
In early September 2006, Rusevlyan electronically transmitted a form lease for the third floor of the Court Street building *1023 to a representative of APS “so that [APS] could make modifications.” That document included an option for APS to obtain “exclusive” parking spaces for an extra monthly fee rather than nonexclusive parking that would be shared by other tenants. APS’s representative electronically transmitted back to Rusevlyan another lease reflecting APS’s proposed modifications. In that document, APS indicated that it did not want exclusive parking spaces. After Sak reviewed the proposal from APS, Rusevlyan electronically transmitted back to APS’s representative a proposed lease that incorporated the modifications to the original form lease that were acceptable to Sak. Sak testified that, aside from reviewing those documents, he did not negotiate the terms and conditions of the lease between Court Street and APS. Negotiating the terms of the lease, Sak testified, “[was] Rusevlyan’s job.”
While those documents were being generated and reviewed, Sak and Brown continued discussing design plans for the third floor of the building. In September 2006, Sak and Brown met with an architect at the building to “define the rules of engagement” and to review a design plan. Around that time, Sak again discussed his plan for the atrium addition with Brown. Brown testified that Sak’s plan for the atrium addition was “fine with [APS] ” so long as, “once you walked into the building, you walk down through a hallway.”
On October 19, 2006, the parties signed a lease for the third floor of the Court Street building (“the October 2006 lease”). The October 2006 lease named SRS Group, L.L.C., as the landlord and APS as the tenant. Brown testified that she did not negotiate any portion of the October 2006 lease and that she did not read it. She also testified that, at the time APS entered into the October 2006 lease, APS knew that the Court Street building was a multi-tenant building, it knew that there was only one elevator and that people other than patients of APS would be using that elevator, and it knew that a gym would be operating on the first and second floors of the building.
Exie Wallace, the business office manager for APS’s Florence office, testified that APS knew that their patients would have to ride the elevator up to the third floor of the building and that there would be other people on that elevator. She testified that APS knew that, when the patients exited the elevator on the third floor, other people on that elevator would know that they were entering into APS’s office space. She testified that APS knew “from the very beginning” that there would be a gym in the building.
The October 2006 lease term was to begin on June 1, 2007, and APS was obligated to start paying rent at that time. The delay of the commencement date of the lease, Rusevlyan testified, was to allow time for the space to be renovated to meet the requirements-of APS. Construction of the APS office space began shortly after the October 2006 lease was signed. Sak testified that, between October and December 2006, he had very little communication with APS, but, he stated, in January 2007 he and Brown became “highly engaged” in the design process. Also in January 2007, Make Believe took occupancy of the space and began .operating the MAC.
During a visit to the site in early 2007, Brown talked to Sak about the elevator opening up directly into the third-floor office space. She asked Sak if he could put a door between the elevator and APS’s office space that would allow for more privacy. Sak explained that it was not feasible to do so because of the design of the space. In February 2007, Brown approved the design plans for the APS space.
*1024 On May 31, 2007, at the request of Sak, TUPS signed an amended lease naming Court Street as the landlord (“the amended lease”). See note 1, supra. The terms and conditions of the amended lease were essentially the same as those contained in the October 2006 lease. The lease term began on June 1, 2007, and terminated five years thereafter, on May 31, 2012, “unless sooner terminated as hereinafter provided.” The amended lease required APS to pay “an annual base rent in equal monthly installments plus a three percent (3) annual increase.” According to Sak’s testimony, the monthly installments were as follows: for the first lease year: $6,195.38 (or $74,344.50 annually); for the second lease year: $6,381.24 (or $76,574.84 annually); for the third lease year: $6,572.68 (or $78,872.13 annually); for the fourth lease year: $6,769.86 (or $81,238.32 annually); and for the fifth lease year: $6,972.96 (or $83,675.47 annually).[2] The amended lease also required APS to pay a 5% monthly service charge and interest on late payments:
“2.3 Due and Payable .... If Tenant does not pay rent on the day when the same shall become due and payable, and such failure shall continue for a period of seven (7) days, Tenant shall pay to Landlord a service charge at the rate of five (5%) percent per month on' the amount of such rent or any additional rent(s), or all of them, for each month or portion of a month that same shall remain unpaid.
[[Image here]]
“2.6 Interest. If Tenant should default in the payment, when due, of any of the Rent herein provided or any part thereof, or any other sum due by Tenant hereunder, then, Tenant shall pay interest at an annual rate equal to twelve percent (12%) on all such arrearages until paid, accounting from the date on which payment was due.”
The amended lease also contained a provision stating that, if APS was in default, Court Street “may ... declare the entire balance of the Rent for the remainder of the Term to be due and payable, and collect the balance.” Neither the October 2006 lease nor the amended lease con-' tained a provision for exclusive parking spaces for APS or a provision requiring Court Street to obtain the consent of APS before leasing to other tenants. The amended lease required APS to provide Court Street with written notice of any alleged default by Court Street:
“18.17 Notice of Landlord’s Default. In the event of any alleged default in the obligations of Landlord under this Lease, Tenant will deliver to Landlord written notice listing the reasons for Landlord’s default and Landlord will have ninety (90) days following receipt of such notice to cure such alleged default or, in the event the alleged default cannot reasonably be cured within a 30-day period, to commence and proceed diligently to cure such alleged default.”
On or about June 4, -2007, APS began occupying the third floor of the Court Street building. Brown testified that she had told Wallace that APS knew about the construction of the atrium addition when they signed the lease and that “[i]t is going *1025 to be bad for a few months. Just hang in there.” On August 14, 2007, Sak sent an email to Doyle Stewart, Chief Financial Officer for APS, stating: “The final addition to the building will begin construction this week which will impact everyone, but I am certain patience will win out. The construction must be completed by December 1[, 2007,] to comply with my loan requirements.” Stewart responded: “[TJhanks.... Our staff are enjoying the building. We will work with you on any problems with the construction.” Stewart testified that “we knew and there is no dispute about [the fact] that there was going to be construction noise.... And I knew that at times it would be pretty bad.”
Construction of the atrium addition was completed in December 2007. The addition was built out from the former main entrance at the rear of the Court Street building. The entrance to the atrium addition from the parking lot became the new main entrance to the building. A hallway led from the new main entrance to the elevator bay approximately 60 feet away. The MAC occupied the space on the left and the right sides of the atrium, and the entrance to the MAC was to the right of the main entrance to the building. A rail and a rope, along with several partitions 10 or 15 feet high, separated the MAC from the hallway. Between each partition, there was a metal railing.
At some point before January 2008, the MAC began operating as “Gold’s Gym.” Around that time, APS began complaining about noise coming from the gym. Management at the gym made efforts to reduce the noise, but, according to testimony from some of the witnesses for APS, the noise issue was never completely resolved.
On or about January 22, 2008, Sak received a letter from Stewart stating that APS had three complaints about the Court Street building. Those three complaints, Sak testified, “were generally noise, parking!,] and confidential access, and [APS] was stating that [Court Street] was in violation of the lease on those three topics.” On January 25, 2008, Sak’s attorney wrote a letter to APS asking for clarification of the basis for the complaints so that Sak could address APS’s concerns. On February 11, 2008, Sak received another letter from APS alleging that Court Street was in breach of the amended lease for failing to provide confidential access to the third floor and for providing inadequate parking. APS also notified Court Street that it had allegedly breached a covenant of quiet enjoyment in the lease.
Regarding APS’s complaint about the noise, Sak testified that he spoke with the management of the gym and that the gym agreed to stop conducting classes involving music in the gym during APS’s business hours. Sak also testified that he had plans to acquire noise barriers to reduce the sound that could be heard in APS’s office. Regarding the complaint about parking, Sak testified that APS had not included the option to obtain exclusive parking in the lease it had proposed during negotiations and that there were no provisions in the October 2006 lease or the amended lease regarding exclusive parking. Sak testified that, in an effort to accommodate APS, he offered to dedicate an area of the parking lot for the use of APS’s staff.
Regarding the complaint about inadequate confidential access to APS’s office, Sak said that APS never asked for an exclusive way for its patients to access the third floor from the parking lot. Sak testified that he had installed partitions to obstruct the view of the hallway from the gym, as APS had requested; nevertheless, Sak also started designing fabric-screen dividers, apparently in an effort to improve privacy. At the request of APS, Court *1026 Street provided a private entrance to APS’s office for doctors and counselors.
Sak testified that, on or about March 25, 2008, he made proposals to APS to address the complaints. Sak testified that, shortly after making the proposals, he received another letter from APS stating that Court Street was in default of the terms of the amended lease. On April 1, 2008, APS vacated the third floor, gave the keys ,to APS’s office space and the building to Sak, and stopped making the rent payments required under the amended lease.[3]
On April 21, 2008, Court Street filed a complaint against APS in the Lauderdale Circuit Court (“the trial court”), asserting a claim of breach of the amended lease. Court Street alleged that APS had abandoned the property, that it had failed to pay rent, and that it had failed to allow Court Street a sufficient amount of time to cure the alleged defaults. APS filed an answer generally denying that it had breached the lease agreement and a counterclaim alleging fraud, breach of warranty, and breach of the covenant of quiet enjoyment. APS also asserted that Court Street was in default of the terms of the amended lease.
The trial court entered a summary judgment in favor of Court Street and against APS and awarded damages in the amount of $436,502.26. APS appealed the judgment to the supreme court. The judgment was reversed because, the supreme court held, APS had presented sufficient evidence of a “genuine issue of material fact as to whether, through misrepresentation and the suppression of material facts, Sak fraudulently induced APS to enter into the May 31, 2007, lease agreement.” Alabama Psychiatric Servs., P.C. v. 412 S. Court St., LLC, 81 So.3d 1239, 1249 (Ala.2011). Following remand, the case proceeded to a jury trial.
Sak testified that, in an effort to mitigate the financial loss to Court Street after APS vacated the third floor, he placed a sign on the building advertising space for rent in. the building; that he reengaged Pro South Realty and another real-estate company to advertise the space for rent on the Internet; that he solicited other businesses to rent the space; and that, in addition to the work that the other realty companies were doing, he had personally shown the space to prospective tenants on several occasions. Sak testified that the third floor in the Court Street building was not leased again until March 2013, or ap-' proximately nine months after the date that the amended lease with APS was scheduled to expire.
Sak testified that APS had paid rent for the first 10 months in the first lease year but that it had not paid any rent thereafter. Sak testified that APS owed rent for the two months of unpaid rent for the first lease year ($12,390.76), plus unpaid rent for the four years that remained on the lease term, for a total of $332,751.58. He fhrther testified that APS owed $16,637.58 per month for 62 months based on the 5% service charge, which totaled $1,310,-529.96;[4] that APS owed $205,120.84 in interest on the unpaid rent and $236,919.14 in interest on the service charges; and that the total amount of damages to Court Street under the provisions of the amend *1027 ed lease was $1,806,321.52. The amortization chart reflecting these figures and calculations w;as introduced into evidence at trial without objection from APS.
APS presented evidence disputing Sak’s testimony about the negotiations that led to the execution of the October 2006 lease and the amended lease. APS presented testimony in support of its claim that Sak had misled APS employees about the nature of the atrium addition and the extent of the operations of the gym, that APS had requested design plans that ensured'anonymity and confidentiality for patients of APS and that Saks had promised to provide both, that patients of APS had refused to keep their appointments owing to the design of the building and the noise, and that Sak’s description of certain events was inaccurate. APS claimed it was justified in leaving the office space and that Court Street was in default of the amended lease.
Following the close of evidence at trial, Court Street moved for a judgment as a matter of law regarding its claim against APS. The trial court denied the motion. APS dismissed its counterclaims, and the case was presented to the jury solely on Court Street’s claim of breach of contract. The trial court instructed the jury, in part, as follows:
“[Court Street] says that [APS] breached the contract by abandoning the leased property, failing to pay rent[,] and failing to allow [Court Street] time to cure any alleged defaults. [APS] denies that it breached the contract.
“So you must decide one, did [Court Street]... and [APS] enter into a contract with each other[;] [two,] [i]f so, did [Court Street] do all of the things the contract required it to do[;] and [three], did [APS] fail to do the things that the contract required it to do. If you find these three issues for [Court Street], you must then decide whether it was harmed by [APS’s] breach.
“If [Court Street] was harmed, you must decide what amount of money will fairly and reasonably compensate it for the harm.
[[Image here]]
“[Court Street’s claim is for breach of contract. If [Court Street] has proved its claim, your verdict must be for it. If [Court Street] has not proved its claim, your verdict must be for [APS]. If [Court Street] has proved its claim, you must then consider damages. You must decide how much money to award [Court Street]. The money you award is called damages. [Court Street] asks you to award it compensatory damages for the harm caused by [APS]. [Court Street] must prove the amount of compensatory damages to your reasonable satisfaction from the evidence and the reasonable inferences from the evidence. You cannot guess at the amount of damages.
“... Compensatory damages are awarded to fairly and reasonably compensate for the harm caused by another’s wrongful conduct.”
The trial court instructed the jury that both parties agreed that a contract existed.
Regarding the defenses raised by APS to Court Street’s breach-of-contract claim, the trial court instructed the jury that APS asserted it was not liable because it “was fraudulently induced to enter into the contract,” “because its agreement was obtained by fraud,” “because [Court Street] breached its right to quiet enjoyment of the property,” because “[Court Street] ... intentionally or mistakenly made a false statement that harmed [it],” because “[Court Street] hid or withheld important facts from it,” and because “[Court Street] promised to provide it with certain amenities in the commercial building.” The trial *1028 court then instructed the jury that if it found any of these issues in favor of APS, the verdict must be in favor of APS and Court Street could not recover at all.
The jury returned a verdict in favor of Court Street and against APS and assessed damages in the amount of $12,390.76. The trial court entered a judgment on the verdict. Court Street filed a timely motion for a new trial pursuant to Rule 59, Ala. R. Civ. P., alleging that the damages award was inadequate and that Court Street was entitled to a new trial. After a hearing, the trial court denied the motion. Court Street then filed a timely appeal to the supreme court. The appeal was transferred to this court by the supreme court pursuant to § 12-2-7(6), Ala. Code 1975.
This court notes that Court Street’s claim for an award of attorney fees pursuant to the terms of the amended lease remains pending. Regardless, as this court has held:
“ ‘[A]n unadjudicated claim for an attorney’s fee does not affect the finality of a judgment.’ [Blankenship v. Blankenship] 963 So.2d [112,] 114 n. 2 [ (Ala.Civ.App.2007) ]. In Blankenship, which (like this case) involved a judgment of divorce, we cited State Board of Education v. Waldrop, 840 So.2d 893 (Ala.2002), in which the Alabama Supreme Court (whose decisions bind this court, see § 12-3-16, Ala.Code 1975) expressly recognized that ‘a decision on the merits disposing of all claims is a final decision from which an appeal must be timely taken, whether a request for attorney fees remains for adjudication.’ 840 So.2d at 899; accord Stiff v. Ala-bama Alcoholic Beverage Control Bd., 933 So.2d 348, 352 n. 7 (Ala.2006) (ruling that trial court’s entry of a summary judgment in favor of defendants on all claims was not, under Waldrop, to be construed as denying plaintiffs request for an award of attorney fees); cf. Niezer v. SouthTrust Bank, 887 So.2d 919, 923 (Ala.Civ.App.2004) (‘attorney-fee matters are separate and distinct from matters going to the merits of a dispute and ... an appeal may be taken from a final judgment as to either aspect of a case’).”
Edwards v. Edwards, 999 So.2d 939, 941 (Ala.Civ.App.2008). See also Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202-03, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (“[A] decision on the merits is a ‘final decision’ ... whether or not there remains for adjudication a request for attorney’s fees attributable to the case.”). Therefore, the pending claim for attorney fees does not affect the finality of the judgment.
On appeal, Court Street argues that the jury’s award of $12,390.76 in damages was inadequate and that the trial court erred in denying Court Street’s motion for a new trial. For the following reasons, we agree.

Standard of Review

“[An appellate court] will not disturb a jury’s verdict unless ‘the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury’s verdict was wrong' and unjust.’ Campbell v. Burns, 512 So.2d 1341, 1343 (Ala.1987). Moreover, ‘ “denial of a motion for a new trial strengthens the presumption of correctness afforded to a jury verdict.” ’ Keibler-Thompson Corp. v. Steading, 907 So.2d 435, 440 (Ala.2005)(quoting Bowers [v. Wal-Mart Stores, Inc.], 827 So.2d [63] at 73 [ (Ala.2001) ]).”
Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330, 334 (Ala.2006). And, in Wells v. Mohammad, we explained:
*1029 “ ‘When reviewing a motion for new trial on the grounds of inadequate damages, the reviewing court must consider whether the verdict is so opposed, to the dear and convincing weight of the evidence as to clearly fail to do substantial justice, and whether the verdict fails to give substantial compensation for substantial injuries. Orr v. Hammond, 460 So.2d 1322 (Ala.Civ.App.1984). In addition, the reviewing court must keep in mind that a jury verdict is presumed to be correct and will not be set aside for an inadequate award of damages unless the amount awarded is so inadequate as to indicate that the verdict is the result of passion, prejudice, or other improper motive. Orr v. Hammond, supra.’ ”
Wells, 879 So.2d 1188, 1194 (Ala.Civ.App.2003) (quoting Helena Chem. Co. v. Ahern, 496 So.2d 12, 14 (Ala.1986)).

Analysis

Court Street contends that the evidence establishing damages in the amount of $1,806,321.52 was uncontradicted and that the jury’s verdict of $12,390.76 imper-missibly varied from the undisputed evidence of damages. Thus, Court Street contends that the jury’s verdict cannot-stand and that it was entitled to a new trial. APS contends that it was solely within the jury’s province to determine an amount that would “fairly and reasonably compensate” Court Street for its loss based on the charge to the jury defining compensatory damages and that the award of $12,390.76 was adequate. Because neither party objected to any portion of the jury charge, APS argues, the jury instructions were unchallenged and thus became “the law of the case.” Our supreme court has explained:
“‘It is well established that ‘“[u]n-challenged jury instructions become the law of the case.’ ” Alabama Dep’t of Transp. v. Land Energy, Ltd., 886 So.2d 787, 795 (Ala.2004) (quoting Clark v. Black, 630 So.2d 1012, 1017 (Ala.1993)); BIC Corp. v. Bean, 669 So.2d 840, 844 (Ala.1995). It is also a sound principle that juries are authorized to return verdicts only as to claims on which they have been instructed. Alpha Coal Co. v. National Cement Co., 420 So.2d 275 (Ala.Civ.App.1982); Travelers Indem. Co. v. Capitol City Haulers, Inc., 393 So.2d 1012 (Ala.Civ.App.1980). “Argument of counsel to a jury does not replace the court’s charge to the jury.... The jury cannot be left without a rudder as to what [it is] called upon to decide and as to the law applicable thereto.” [Traveler’s Indem. Co.,] 393 So.2d at 1015.’ ”
Kult v. Kelly, 987 So.2d 551, 557 (Ala.2007) (quoting Regions Bank v. Plott, 897 So.2d 239, 246-47 (Ala.2004)) (alterations in original). When the parties express their approval of the jury instructions by declining to object, any claim based on an allegedly defective or inadequate instruction is waived, and a general verdict returned by the jury can be analyzed only regarding claims on which it was instructed. Id.
An unchallenged charge must be viewed in its entirety.. Here, the jury was specifically charged: “[Court StreetJ’s claim is for breach of contract. If [Court Street] has proved its claim, your verdict must be for it.” The jury was told that it could not find in favor of Court Street if it found in favor of APS regarding any of its defenses to Court Street’s claim of breach of contract. The jury returned a general verdict in favor of Court Street; thus, the jury necessarily rejected APS’s defenses to liability based on fraudulent inducement, breach of the covenant of quiet enjoyment, deceit, concealment, and promissory fraud.
*1030 Having established that the jury found APS liable for breach of the amended lease, we must examine the claim that the damages award was inadequate. The amount of damages sought by Court Street was determined from terms contained in the amended lease; specifically, Court Street sought damages in the amount of unpaid rent together with accrued service charges and interest. No issues have been raised by APS regarding the manner in which the amount of damages was calculated by Court Street. The amount of damages awarded by the jury was $12,390.76, the amount of rent remaining unpaid for only the first year of the five-year lease term. No amount was awarded for the remaining four years of the' term or for interest or the service charges.
Damages are considered inadequate when they are not sufficient to compensate for proven losses. Kinard v. Davis, 594 So.2d 157, 159 (Ala.Civ.App.1992). “[W]here liability is established, the jury’s assessment of damages must include, at the least, an amount sufficient to compensate the plaintiff for his or her uncontradicted special damages-” Smith v. Darring, 659 So.2d 678, 679 (Ala.Civ.App.1995). At trial, APS offered no evidence to contradict the evidence of damages due under the terms of the amended lease,, and APS does not direct us to testimony or other evidence suggesting that the amount of damages was in dispute. Instead, APS focused on disputing liability only. APS correctly states that the jury was instructed to weigh the credibility of the witnesses and that it had the discretion to disregard any part of the testimony of any witness that it found to be lacking in credibility; any evidence contradicting Sak’s testimony and any attempt to impeach Sak appear to have been directed solely to APS’s defenses to liability that were rejected by the jury and not to the damages amounts ascertainable from the terms of the amended lease. The evidence of damages provided by Court Street at trial, which evidence reflected damages in the amount of $1,806,321.52, was uncontra-dicted.
APS also contends that the jury could have found that Court Street was in default under the terms of the amended lease, that APS was “within its rights” to terminate the lease, and that the jury could have determined that a damages award of only two months of rent was appropriate. Section 18.17 of the lease required that APS afford Court Street 90 days to cure any alleged default. APS argues that the jury could have determined that APS was liable only for two months additional rent, because APS had moved out two months before the first-year lease term expired without giving Court Street the required advance notice. But the jury was instructed it could find for Court Street only if it had “[done] all of the things the contract required it to do.” The jury found for Court Street and rejected all the defenses raised by APS. Therefore, based on the instructions, the jury could not have apportioned or assessed damages based on a finding that Court Street was in default. Furthermore, the jury was not instructed that it could apportion damages in this manner.
Although the assessment of damages is largely committed to the jury’s discretion, “ ‘[a] jury [does not] have the right to arbitrate or compromise differences between the parties.’” Stone v. Echols, 351 So.2d 902, 903 (Ala.1977) (quoting Donavan v. Fandrich, 265 Ala. 439, 440, 92 So.2d 1, 2 (1957)). A “jury does not have an absolute right to disregard the testimony of competent witnesses and substitute its own conclusion for undisputed evidence.” Farmers & Ginners Cot *1031 ton Oil Co. v. Reliance Ins. Co., 341 So.2d 147, 148 (Ala.1976). When the only evidence of damages presented is uncontra-dicted and undisputed, as it is in this case, a jury’s verdict for damages that varies substantially from that amount cannot be said to provide substantial compensation for substantial injury. See Wells, 879 So.2d at 1194 (quoting Helena Chem. Co., 496 So.2d at 14, citing in turn Orr v. Hammond, 460 So.2d 1322 (Ala.Civ.App.1984)).
We therefore hold that the jury’s award for damages was inconsistent with the jury’s determination that APS had breached the amended lease.. Thus, the award of only two months of rent is “ ‘so opposed to the clear and convincing weight of the evidence as to clearly fail to do substantial justice.’ ” Wells, 879 So.2d at 1194 (quoting Helena Chem. Co., 496 So.2d at 14). For these reasons, we conclude that the verdict must be set aside and that Court Street’s motion for a new trial must be granted by the trial court on all issues. See Rule 59(a)(1), Ala. R. Civ. P.

Conclusion

Based on the foregoing, the order denying Court Street’s motion for a new trial is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. The term "landlord” was defined in the lease as "Eugene R. Sak doing business as 412 South Court Street, LLC.” Neither party contests that Court Street was the landlord and was entitled to bring the action.

. These amounts are based on Sale’s testimony. Some of the total-annual-rent amounts for each year that Sak stated are inconsistent with those listed on an amortization chart introduced into evidence by Court Street, which lists the following amounts: for the second lease year: $76,574.90 annually; for the third lease year: $78,872.13 annually; and for the fifth lease year: $83,675.47 annually. We note, however, that $6,381.24 multiplied by 12 is $76,574.88, that $6,572.68 multiplied by 12 is $78,872.13, and that $6,972.96 multiplied by 12 is $83,675.52.

. Sak testified that, in February 2008 — 17 days after Sak received the first notice of default from APS — APS signed a new lease with its former landlord to rent the space at the Helton Drive office. •

. We note that $16,637.58 multiplied by 62 actually equals $1,031,529.96. We also note that the amortization chart that Court Street introduced into evidence at trial shows that APS owed $16,637.58 per month for 62 ■ months based on the 5% service charge, which totaled $1,031,529.96.