THOMPSON, Presiding Judge.
Rosalyn M. Caplan instituted this tort action against Patty Benator and Linda Fleet ("the daughters"), the executors of the estate of their late father, Edgar K. Simon, Jr., in connection with conduct that occurred in the days and weeks after Simon died. After a trial in the Montgomery Circuit Court ("the trial court"), a jury returned a verdict in favor of Caplan and awarded her $1 in damages. The trial court entered a judgment on the jury's verdict, and Caplan appeals.
The evidence adduced at trial indicates the following. Caplan, who was 93 years old at the time of the trial, testified that she had been in a romantic relationship with Simon for about 14 years. Caplan and Simon lived together at Simon's house ("the house") in Montgomery for approximately ten years before his death in 2015. Caplan had no ownership interest in the house.
Simon executed a will ("the will") on June 2, 2009. Among other things, the will provided:
"At the time I make this Will, I currently own [the house] and all contents located therein .... If I own such at the time of my death, I hereby will, devise and bequeath [the house] and all contents therein and all insurance thereon, to my two surviving children, in equal shares, share and share alike, subject to the holdover period provided herein. Provided she is living in [the house] at *675 the time of my death, I give and grant to my friend, Rosalyn Caplan, the right to live and remain in [the house] for a period of ninety (90) days following my death. During such time, she shall be allowed to continue to occupy and continually occupy [the house] for a period of ninety (90) days and enjoy the contents therein.
"During said holdover period, Rosalyn Caplan shall not be responsible for any cost, maintenance, repair or upkeep of [the house]. She shall not be responsible for the payment of any insurance or any ad valorem taxes assessed against [the house].
"....
"Upon vacating [the house] Rosalyn Caplan shall notify my Executors, in writing, at which time all right, title, and interest in and to [the house] along with its beneficial use shall pass immediately to my surviving children, in equal shares, share and share alike."
Simon appointed the daughters as the executors of his will. The will "authorize[s] and empower[s] my Executors and each Executor to exercise all powers as are granted to my Trustee and to make all distributions that the Trustee is permitted to make under this Will, regardless of whether or not any trust authorized by this Will shall have then become operative."
Regarding the powers of the trustee, the will states:
"A. "Without limitation of the powers conferred by statutes or general rules of law, the Trustee shall have the following powers and authorities, in addition to others now or hereinafter conferred by law with respect to any property or rights held by each trust:
"....
"(d) To sell, transfer, assign and convey any of the property of the trust or any interest therein, or to exchange the same for other property, in a public or private sale or transaction, for such price or prices and upon such terms and conditions as in its absolute discretion and judgment may be deemed for the best interest of the trust and the beneficiaries hereunder, and to execute and deliver any deeds or conveyances (with or without warranty), receipts, releases, contracts, leases, subleases, assignments, transfers or other instruments necessary or appropriate in connection therewith;
"....
"(f) To make all repairs and improvements at any time deemed necessary or proper to and upon real estate and any buildings or improvements situated thereon ...;
"....
"(m) To appoint, employ, remove and compensate such accountants, attorneys, agents, ... and representatives, ... as the Trustee deems necessary or desirable for the administration of the trust ...;
"....
"(t) To do all other acts which in the Trustee's judgment are necessary or desirable, for the proper and advantageous management, investment and distribution of any of the trusts;
"....
"C. The powers herein granted to the Trustee may be exercised in whole or in part, from time to time, and shall be deemed to be supplementary to and not exclusive of the general powers of trustees pursuant to law, and shall include all powers and authority reasonably necessary to carry the same into effect."
*676 In April 2015, Simon, who had been diagnosed with cancer, was under hospice care. Caplan notified the daughters that Simon's death was imminent, and the daughters and their husbands arrived at the house on April 21, 2015. Simon died in the early morning hours of April 22, 2015.
Caplan testified that, on the day Simon died, Fleet asked Caplan to give her the joint credit card that Caplan had with Simon. Caplan said the card had been used for joint expenses such as groceries and that Simon had paid the credit-card bill each month. At Fleet's request, Caplan said, she also gave Fleet the extra set of car keys to Simon's automobile. Caplan had her own vehicle. On the day Simon died, Caplan also enabled Fleet to see Simon's accounts on the computer. Caplan said that the daughters also began removing "things" from the walls and putting things in boxes.
Benator testified that, on April 25, 2015, four days after Simon had died, she received a telephone call from Caplan's son, Stan Caplan ("Stan"), who lived in San Diego. The next day, Benator said, she received an e-mail from Stan, who was following up on the telephone conversation. The e-mail read, in part: "You and your family are not welcome to visit [the house] and are formally noticed not to communicate directly with my mother. In the event of an emergency, you may contact me." Benator testified that Stan was the intermediary between Caplan and the daughters.
The daughters next came to the house on April 29, 2015, accompanied by an attorney and a real-estate agent. Caplan acknowledged that that visit had been arranged before the daughters arrived and that she was agreeable to that visit. She said that she believed that Stan had made the arrangements. Caplan said that she had no interaction with the daughters that day; she spoke only with the attorney. She also agreed that no one threatened or harassed her on that day. The real-estate agent did a walk-through of the house to assess the house and to see what repairs might be needed. Benator said the visit lasted 30 minutes at the most.
Benator and her daughter, Jaime, returned to the house on May 14, 2015. Caplan testified that she was aware they were coming to the house that day so that Jaime could see the contents of the house, but she did not recall how she learned Benator and Jaime were coming. Caplan was aware that, after she vacated the house, Jaime was going to take some of Simon's furniture and household items for her apartment. Once again, Caplan testified that she was agreeable to that visit.
However, at that visit, Benator took silverware from the house, which upset Caplan. Caplan explained that, at the time of Simon's death, she and Simon had been using the silverware that had been kept in a vault until about five or so years before. Caplan said that they had discarded the "old silver" Simon had had for about 35 years or so. However, when Benator and Jaime came to the house on May 14, 2015, Caplan said, Benator took the silverware and "ran out the door." Caplan said that she had asked Benator not to take the silverware because she was using it. The evidence was undisputed that there was other silverware in the house that Caplan could use. Caplan also conceded that she knew the silverware Benator took from the house had belonged to Simon's wife, the daughters' mother. The silverware was engraved with the initials of the daughters' mother. After Benator left with the silverware, Caplan notified the police, but she did not execute a warrant.
Caplan said that she had no communications with the daughters between the time Benator left the house on May 14, 2015, *677 and when the daughters next came to the house on June 8, 2015. Caplan also testified that, during that period, she had had no problems with her heart other than what she called her "usual complications," which included angina. Caplan also testified that she "had a problem" with her heart and began seeing a cardiologist in 2005. As a result of her heart problems, Caplan said, she takes "a lot of medication" and has to exercise.
However, Caplan said, on June 8, 2015, she was awakened by the sound of keys in the door. She said that she believed someone was breaking into the house. Caplan said that she went into the kitchen and saw the daughters "trying to break in my house." She added that she saw Fleet at the back door and Benator "running all around the house, trying all the doors and windows." She said that she did not let the daughters in the house because, she said, she "did not want to be bothered or disturbed or made sick."
Caplan testified that, even after she recognized the daughters, she felt panic and was scared. She said that she could feel her blood pressure rising. She said that the daughters saw her, and she indicated to them that she was calling the police. Caplan testified that the daughters told her "in a very menacing way" that they would be back to the house, and they left.
Benator testified that the daughters had arranged to come to the house on June 8, 2015, to meet with an estate-sale representative. An e-mail from the daughters to Caplan dated June 4, 2015, a copy of which was sent to Stan, informed Caplan that they would be in Montgomery on June 8 and needed access to the house. Benator explained that the daughters, both of whom lived in Atlanta, would be passing through Montgomery that day on their way home from a memorial held for their father at the beach. In the e-mail, the daughters suggested that they visit the house about 2:30 or 3:30 that afternoon, adding that they wanted "to make this as convenient as possible." A few minutes after that e-mail was sent, Benator said, she received an e-mailed response from Stan, copies of which were sent to Fleet and an attorney working with the daughters, that said: "You're not allowed on the property. The police will be called the moment you trespass." Benator said that the tenor of the e-mails that were exchanged leading up to the daughters' arrival at the house on June 8, 2015, was the same.
Benator testified that the daughters arrived in Montgomery early, about 11:00 or 11:30 a.m., and decided to just drive past the house and then have lunch before going to the house to meet the estate-sale representative. When they drove by the house, Benator said, they noticed that the vehicle of the driver who sometimes assisted Simon and Caplan was in the driveway and that Caplan's vehicle was not in the garage, so they stopped. They went to the side door that they had always used and rang the doorbell, Benator said. No one answered, and they knocked on the door. When no one answered, Benator said, they decided to start Simon's automobile, which was in the garage and had been sitting idle for several weeks. The garage door was locked, Benator said, adding that she had not known that door to be locked in 40 years. She had difficulty putting the key in the lock, Benator said, and the door would not open. Stan had not responded to the daughters' request for a time when Caplan would be moving, she said, so they thought perhaps Caplan had already moved. The furniture Simon had kept on the patio was not there, and they looked in the windows of the den to see whether Caplan's furniture was gone. Benator said that she then tried her key in the side door, and, again, her key would not work. After trying her *678 key in the front door and discovering that that did not work either, Benator said, the daughters realized that the locks to the house had been changed. As the daughters went back around the house toward their vehicle, Benator said, she saw Caplan through the window, standing by the back door with her arms crossed. When Caplan did not make an effort to let them in, Benator said, Benator told her they would be back, and the daughters left.
Before the daughters returned to the house to meet the estate-sale representative, Benator testified, they contacted the Montgomery Police Department to explain their presence and asked if an officer could accompany them to the house. Two officers met them at the house, she said. Benator disputed Caplan's testimony that Caplan rode up to the house after they had already arrived. Instead, Benator said, Caplan was already in the house and the driver was leaving when the daughters arrived at the house. Benator testified that one of the officers knocked on the door and Caplan said that the daughters were not allowed in the house. After a discussion with the officers, Fleet and the estate-sale representative were permitted to enter the house, but Benator was not allowed inside. Fleet and the representative left the house within 30 minutes, Benator said, and the police officers stayed at the house the entire time. Benator said that, while she was there, paramedics were called to care for Caplan, checked Caplan's vital signs, and then left. That was the last time the daughters visited the house while Caplan lived there.
On cross-examination regarding the June 8, 2015, visit, Caplan testified that she understood that the daughters could come into the house. However, she said, they could have waited 90 days, until she left the house. Caplan questioned why the daughters would come to the house when, she said, they knew she did not want company. After the daughters initially came to the house on June 8, 2015, Caplan testified, she called Stan, who told her to obtain a restraining order. She contacted her driver, who took her to the police department. After seeing the police, Caplan told the driver she needed to go home because she was having chest pains and was feeling weak. She said: "[I]t was the usual symptoms, only worse." When Caplan arrived at the house, she said, she saw police officers in her driveway and the daughters were at the house with a man Caplan apparently did not recognize. The police informed Caplan that the daughters had a court order to enter the house to take photographs of the contents of the house. Caplan said that she allowed Fleet to go in the house. Meanwhile, paramedics were called to check on Caplan. She did not go to the hospital at that time.
After the daughters left the house, Caplan said, she called her son and her own daughter. Caplan's daughter arrived in Montgomery the next day. On June 10, 2015, an attorney came to the house to help Caplan obtain a restraining order against the daughters. That night, Caplan said, paramedics were called to the house. Caplan said that she refused to go to the hospital initially, but, when paramedics had to be called a second time that night, she was taken to the hospital where she was diagnosed as having had a heart attack. Caplan was treated and released from the hospital about five days later. She testified that she was "really not the same person" after the heart attack. She described the difficulties she had immediately after the heart attack. She also said that, since she moved to Birmingham, she has been able to drive within a certain area.
Dr. Forrest Flemming, the cardiologist who treated Caplan, testified by means of *679 a video deposition. In his deposition, Dr. Flemming said that it was his opinion that a combination of things led to Caplan's heart attack, including the stress brought about by Simon's death, her imminent move, her poor health, and the daughters' visits to the house, which, he said, "was the straw that broke the camel's back, as it were." Even Caplan's own attorney's visit to the house after the daughters' June 8, 2015, visit could have been a contributing cause of the heart attack, Dr. Flemming said. He added that he could not say which event, if any, caused the heart attack. He also stated: "I would not say that this event [the daughters' June 8, 2015, visit to the house] on its own did this" and "[a]s far as I know, and all of my-all the evidence was she was going to have a heart attack at some point."
When Caplan was asked whether she was requesting that the jury award her money damages, Caplan replied: "I want justice, justice. And the money damages, that's up to y'all."
In her complaint against the daughters, Caplan alleged claims of trespass, negligent breach of fiduciary duties, wanton breach of fiduciary duties, negligence, and wantonness based on the events described above. Before the trial began, the trial court entered a summary judgment in favor of the daughters on the trespass claims. After hearing the trial testimony, the trial court declined to charge the jury regarding wantonness, wanton breach of fiduciary duties, and punitive damages. The jury returned a general verdict in favor of Caplan on the claims of negligence and negligent breach of fiduciary duties and awarded her compensatory damages in the amount of $1. The trial court entered a judgment on the verdict and denied Caplan's motion for a new trial, which was based in part on the ground of inadequate damages. Caplan appealed the judgment to our supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
On appeal, Caplan first contends that the trial court erred in denying her request for a new trial based on what she said were inadequate damages. She asserts that the award of $1 in damages was inadequate compensation for her injuries and was inconsistent with the jury's determination that the daughters were liable to her for their conduct.
"In Alabama, jury verdicts are presumed to be correct and that presumption of correctness is further strengthened by a trial court's denial of a motion for new trial. The appellate court reviews the tendencies of the evidence most favorable to the prevailing party and indulges such inferences as the jury was free to draw. Accordingly, when a judgment is based on a jury verdict, it will not be reversed unless it is plainly and palpably wrong. Ashbee v. Brock, 510 So.2d 214 (Ala. 1987)."
Dennis v. Lewis, 621 So.2d 301, 303 (Ala. Civ. App. 1993).
" ' "When reviewing a motion for new trial on the grounds of inadequate damages, the reviewing court must consider whether the verdict is so opposed to the clear and convincing weight of the evidence as to clearly fail to do substantial justice, and whether the verdict fails to give substantial compensation for substantial injuries. Orr v. Hammond, 460 So.2d 1322 (Ala. Civ. App. 1984). In addition, the reviewing court must keep in mind that a jury verdict is presumed to be correct and will not be set aside for an inadequate award of damages unless the amount awarded is so inadequate as to indicate that the verdict is the result of passion, prejudice, or other *680 improper motive. Orr v. Hammond, supra. ' "
" Wells [v. Mohammad ], 879 So.2d 1188, 1194 (Ala. Civ. App. 2003) (quoting Helena Chem. Co. v. Ahern, 496 So.2d 12, 14 (Ala. 1986) )."
412 S. Court St., LLC v. Alabama Psychiatric Servs., P.C., 163 So.3d 1020, 1029 (Ala. Civ. App. 2014).
Caplan argues that the jury's award of $1 was inadequate to compensate her for what she says are her "uncontradicted special damages," as well as for her pain and suffering. In her complaint, Caplan alleged that the daughters were the proximate cause of her heart attack, and she sought damages for physical, emotional, and mental injuries that she claimed she suffered as a result of what she says was the daughters' wrongful conduct. She contends that, because the jury found the daughters' liable, it was required to award her monetary damages for her injuries. The daughters' contention throughout the trial and on appeal has been that their actions were not "wrongful" and, further, that they were not the proximate cause of Caplan's heart attack.
Once a defendant's liability is determined, Alabama law requires that the jury's assessment of damages include, at least, an amount sufficient to compensate the plaintiff for his or her uncontradicted special damages, as well as a reasonable amount of compensation for pain and suffering. Paschal v. Nixon, 646 So.2d 110, 111 (Ala. Civ. App. 1994). However, the cases that Caplan cites in support of her argument that the damages awarded to her were inadequate all involve specific events, such as motor-vehicle accidents, in which the proximate cause of the plaintiffs' injuries was clear. See, e.g., Daniel v. Adkins, 676 So.2d 346 (Ala. Civ. App. 1996) (holding that, after a motor-vehicle accident, an award of $1,000 was deemed inadequate when undisputed evidence showed damages of approximately $9,000); Jones v. Butts, 646 So. 2d 104 (Ala. Civ. App. 1994) (plaintiff had been in a motor-vehicle accident and had sustained stipulated damages of $8,700; thus, $1 award was held to be inadequate).
This case is distinguishable from the cases Caplan cites, however, because the proximate cause of her injury, i.e., the heart attack, was in dispute. Even if, as the jury found, the daughters acted negligently, it does not necessarily follow that their negligence caused Caplan's injury.
"It is ... axiomatic that a jury is entitled to award nominal damages in those cases where no causal connection can be found between the damages suffered and the duty breached. Benson v. Vick, 460 So.2d 1309 (Ala. Civ. App. 1984) ; Williams v. Clark, 50 Ala. App. 352, 279 So.2d 523 (1973)."
Courtesy Ford Sales, Inc. v. Hendrix, 536 So.2d 88, 90 (Ala. Civ. App. 1988). Additionally, "[i]t is peculiarly within the province of the jury to resolve conflicts regarding the proximate consequences of a defendant's negligence. Youngblood v. Thornton, 576 So.2d 229 (Ala. 1991)." Dennis v. Lewis, 621 So.2d at 304.
In this case, Caplan suffered a heart attack two days after her last contact with the daughters. Undisputed evidence indicated that Caplan had suffered from a heart condition for years before Simon's death. Her cardiologist, Dr. Flemming, testified that he could not say which of the many recent stressful events in Caplan's life, if any, caused her heart attack. He also stated: "I would not say that this event [the daughters' June 8, 2015, visit to the house] on its own did this" and "[a]s far as I know, and all of my-all the evidence was she was going to have a heart attack at some point."
*681 After reviewing the record, we conclude that, based on the evidence presented, the jury reasonably could have determined that, although the daughters acted negligently in dealing with Caplan, Caplan failed to prove that their negligence was the proximate cause of her heart attack. Accordingly, the trial court did not err in denying Caplan's motion for a new trial based on the inadequacy of the damages awarded to her.
Caplan also argues that the trial court erred in entering a summary judgment in favor of the daughters as to her claim of trespass. Specifically, she argues, the trial court erred in determining that, as a matter of law, executors of an estate have a "right to interfere with the possession of another estate beneficiary without express or implied authority."
In support of her argument, Caplan states that Simon's will gave her the right to "exclusive" possession of the house and its contents for 90 days after Simon's death. Although the trial court did not set forth its basis for entering the summary judgment on the trespass claim, in denying Caplan's request for a preliminary injunction in this matter, the trial court found that
"the right of use and occupancy of [the house] and contents granted to plaintiff Caplan is not exclusive, and it is clear from a reading of other portions of Mr. Simon's will that [the daughters], as appointed personal representatives of the Estate of Edgar K. Simon, Jr., have duties attendant to the repair, maintenance and upkeep of the premises, as well as general rights and duties attendant to their appointment as personal representatives, which justify their presence in and upon the said premises from time to time."
To resolve this issue, we must determine Simon's intent in granting Caplan the right to remain in the house for 90 days after his death, which requires us to apply the following standard.
"When the resolution of an appeal turns on the construction of a will, we apply a de novo standard of review. See Harrison v. Morrow, 977 So.2d 457, 459 (Ala. 2007).
" ' "The law in Alabama regarding the interpretation of wills is well settled:
" ' " '[T]he intention of the [testator] is the law of the will, which the court should consider as a whole, giving effect to each provision where it is possible to do so; it is the court's duty to carry out the [testator]'s intention where that intent can be ascertained. To determine the intent of a testator or testatrix, the court must look to the four corners of the instrument, and if the language is unambiguous and clearly expresses the testator's or testatrix's intent, then that language must govern. Galin v. Johnson, 457 So.2d 359 (Ala. 1984). Where a will contains ambiguous or doubtful expressions, it is the duty of the court to determine what the testator or testatrix intended. Brittain v. Ingram, 282 Ala. 158, 209 So.2d 653 (1968).' "
" ' Barnett v. Estate of Anderson, 966 So.2d 915, 918 (Ala. 2007). "A document is unambiguous if only one reasonable meaning emerges." Kershaw v. Kershaw, 848 So.2d [942] at 951 [ (Ala. 2002) ]. '
" Scholl v. Stacy, 981 So.2d 1116, 1120 (Ala. 2007)."
McKnight v. Way, 58 So.3d 810, 815 (Ala. Civ. App. 2010).
As to the terms of Simon's will, we first note that, contrary to Caplan's *682 contention, no language in the will gives Caplan an "exclusive" right to occupy the house. In reading the will as a whole, it appears that Simon contemplated that the daughters would have to carry out their duties as executors of the will during the 90 days Caplan was permitted to remain in the house. For example, in the will, Simon explicitly stipulated that, "[d]uring said [90-day] holdover period, Rosalyn Caplan shall not be responsible for any cost, maintenance, repair or upkeep of [the house]." Those tasks were explicitly delegated to the daughters, however. The will authorizes the daughters "[t]o make all repairs and improvements at any time deemed necessary or proper to and upon real estate and any buildings or improvements situated thereon." It makes no sense that the daughters would be responsible for the maintenance and upkeep of the house but would not be permitted into the house during the "holdover period."
The daughters, as the executors of the estate, also were given the responsibility of working with agents and representatives involved in the sale of the house and its contents. The will specifically gave them "all powers and authority reasonably necessary to carry the same into effect." The house was not put on the market and its contents were not placed up for sale before Caplan vacated the house. However, the trial court could have found that, in preparation for such acts, it was necessary for the daughters to meet with the real-estate agent and the estate-sale representative and allow those people to assess the inside of the house and its contents. Accordingly, the trial court could have determined that they had to be able to enter the house to fulfill their obligations.
Furthermore, in her appellate brief, Caplan seems to suggest that the daughters were attempting to take possession of the house before the 90-day "holdover period" ended. She cites § 43-2-837, Ala. Code 1975, for the proposition that an executor "shall take possession of the decedent's property" "[except] as otherwise provided by the decedent's will." She also cites Self v. Roper, 689 So.2d 139, 141 (Ala. Civ. App. 1996), for the proposition that a "personal representative is generally not in possession or control of the real property." The language Caplan quoted from Self is set forth in a discussion of the fee to which a personal representative is entitled for the administration of an intestate decedent's estate. Noting that "the personal representative is entitled to a percentage 'of the value of all property received and under the possession and control of the personal representative,' " this court went on to explain that, "[u]nlike personal property, the intestate decedent's real property devolves to the decedent's heirs. That is, the personal representative is generally not in possession or control of the real property." Self, 689 So.2d at 141 (quoting § 43-2-848(a), Ala. Code 1975 ). A review of Self shows that it has no application to this matter.
There is no evidence in the record that the daughters intended to occupy the house before the 90 days had expired or that they ever requested that Caplan move from the house before the 90 days expired. The daughters emphasize that, in requesting access to the house with a real-estate agent on April 29, 2015, and an estate-sale representative on June 8, 2015, they were attempting to carry out their obligations under the terms of the will. In her brief on appeal, Caplan concedes that there is no Alabama authority that prohibits the executors of an estate from entering the testator's residence while carrying out their duties under the will.
In considering the will in its entirety and the unambiguous language contained in the will, we conclude that Simon gave *683 the daughters, as executors of his will, the power and authority to enter the house as necessary to effectuate the terms of the will. There is absolutely no language contained in the will that supports Caplan's position that she had exclusive control over the house and its contents during the 90-day "holdover" period or that Caplan had the legal right to prevent the daughters from entering the house to carry out their obligations under the will. Additionally, we note that Caplan had given her permission for the daughters to enter the house on April 29, 2015, and on May 14, 2015. Benator did not enter the house on the June 8, 2015, visit, and, after discussions with police officers, Caplan permitted Fleet to enter the house on June 8, 2015.
Furthermore, Caplan has cited no legal authority that would permit her to prohibit the daughters from entering the house to carry out their duties. Because in the will Simon gave the daughters, in their roles as executors, the express authority to meet with the real-estate agent and the estate-sale representative at the house, we cannot say that the trial court erred in entering a summary judgment in favor of the daughters as to Caplan's trespass claim.
Caplan next contends that Alabama should recognize the "fiduciary exception" to the attorney/client privilege. Specifically, she maintains that the daughters should not have been able to assert the attorney/client privilege "as protection from discovery of their communications with the Estate's attorneys."
The daughters hired the law firm of Hartley & Hartley to represent the estate. An attorney for that firm ("the attorney") accompanied with the daughters to the house on April 29, 2015. During the course of the litigation in this matter, Caplan sought to subpoena the attorney's files regarding his representation of the estate, and the daughters objected. One of the grounds Caplan raised in arguing that she was entitled to the attorney's files was that the daughters, in their role as executors, were representatives of the beneficiaries of Simon's estate and were therefore consulting the attorney not only on their own behalf but on behalf of all of the beneficiaries under Simon's will. Therefore, Caplan argued, the daughters should not be able to claim privilege against Caplan, a beneficiary, as to their communications with the attorney. The daughters argued, correctly, that, unlike some jurisdictions, Alabama does not recognize the fiduciary exception to the attorney/client privilege.
On August 18, 2015, the trial court entered an order quashing the subpoena for the attorney's files. In doing so, the trial court acknowledged the absence of controlling authority as to this issue, but concluded
"that the weight of authority in Alabama is to the effect that when the personal representative employs an attorney to advise on estate matters, the attorney's client is the personal representative and none other. Furthermore, no exception is delineated in Rule 502 Alabama Rules of Evidence which would abrogate the privilege in this instance."
Alabama already recognizes an exception to the attorney/client privilege that is tangentially related to the fiduciary exception Caplan seeks. Rule 502(d)(2), Ala. R. Evid., provides that, "[a]s to a communication relevant to an issue between parties who claim through the same deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction," there is no attorney/client privilege. In his treatise on Alabama evidence, Dean Charles Gamble has explained that, under the Rule 502(d)(2) exception,
"[w]hen the respective claims of all parties to the litigation arise through the *684 same deceased client, no privilege may be raised as to communications between that client and the client's attorney. This exception finds its most common application in cases where the parties claim under the same will or in intestate succession."
II Charles W. Gamble and Robert J. Goodwin, McElroy's Alabama Evidence § 388.06(2) (6th ed. 2009)(footnote omitted).
In her appellate brief, Caplan does not explain the purpose for wanting to know the substance of the communications between the daughters and the attorney. The gravamen of her argument is that executors hold a fiduciary position as to the beneficiaries of a will and, as a result, the executors should not be able to claim privilege against beneficiaries when seeking legal counsel in connection with their fiduciary duties. This action does not involve a challenge to the will or a claim under the will, which, under certain circumstances would be subject to the Rule 502(d)(2) exception. Instead, this case is about Caplan's belief that the daughters acted improperly toward her after Simon's death, causing her to have a heart attack, and her request for damages based on her negligence claims.
In her brief on appeal, Caplan does not explain to this court what she hoped to learn from the communications between the daughters and the attorney that would be relevant to this action. In other words, Caplan does not explain how the fiduciary exception to the attorney/client privilege that she wants us to adopt would be applicable to her claims.
Rule 26(b)(1), Ala. R. Civ. P., provides, in relevant part:
"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter."
(Emphasis added.)
Because Caplan has not explained how the communications between the daughters and the attorney for the estate would be relevant to this action, this court is of the opinion that this is not the proper case in which to recognize a fiduciary exception to the attorney/client privilege or to expand on the exception already provided by Rule 502(d)(2). We therefore decline to accept Caplan's invitation to recognize such an exception.
Because it is undisputed that Alabama does not currently recognize a fiduciary exception to the attorney/client privilege, see Rule 502(d), Ala. R. Evid., based on the arguments and the record before this court, we will not hold the trial court in error for refusing to allow Caplan to have access to the communications between the daughters and the attorney under the circumstances involved in this action.
Finally, Caplan argues that the trial court erred in refusing to charge the jury on wantonness, wanton breach of fiduciary duty, and punitive damages. Therefore, she says, a new trial is warranted in this matter.
Rule 51, Ala. R. Civ. P., provides, in pertinent part:
"No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless that party *685 objects thereto before the jury retires to consider its verdict, stating the matter objected to and the grounds of the objection."
Thus, to preserve her arguments for appeal that the trial court erred in refusing to give certain instructions to the jury, Caplan was required to have: "(1) objected before the jury retired to consider its verdict; (2) stated the matter that [s]he was objecting to; and (3) supplied the grounds for [her] objection." Ware v. Timmons, 954 So.2d 545, 558 (Ala. 2006). Our review of the trial transcript indicates that Caplan did not object to the trial court's refusal to instruct the jury on wantonness, wanton breach of fiduciary duty, or punitive damages and did not contend in any manner that the trial court should have given any additional instructions. As a result, she has waived her contention that the trial court erred with regard to the jury instructions.
Caplan has failed to demonstrate that the trial court erred to reversal in entering a summary judgment on her trespass claim and in denying her motion for a new trial. After reviewing the record and considering the arguments made on appeal, we conclude that the judgment entered on the jury's verdict in favor of Caplan and the award to her of $1 in damages is due to be affirmed.
AFFIRMED.
Pittman, Thomas, and Donaldson, JJ., concur.
Moore, J., concurs in the result, without writing.