SHAW, Justice.
*43 Baptist Health System, Inc., d/b/a Walker Baptist Medical Center ("WBMC"), appeals from the Walker Circuit Court's denial of its postjudgment motion seeking relief from the judgment entered on a jury verdict in favor of Armando Cantu ("Armando"),[1] as father and next friend of Daniel Jose Cantu ("Daniel"), a minor, on Armando's medical-malpractice claim. For the reasons discussed below, we reverse the judgment and remand the case for a new trial.
Facts and Procedural History
On September 19, 2009, Armando and his wife, Eulalia, took then three-month-old Daniel to WBMC's emergency room for treatment following symptoms including decreased appetite, coughing, and a fever that had lingered for several days. At that time, Daniel was diagnosed by the attending emergency-room physician as suffering from a viral illness (specifically, an upper-respiratory infection ) and was discharged with instructions to continue fluids and to seek further treatment if the symptoms continued. Thereafter, Daniel's condition allegedly further deteriorated into vomiting, suspected dehydration, decreased activity, and "irritab[ility] whenever his neck was touched."
The following day, September 20, 2009, Armando and Eulalia returned with Daniel to WBMC's emergency room. After an initial evaluation by the attending emergency-room physician, Daniel was ultimately admitted and was referred to Dr. James G. Wilbanks, a pediatrician with an office adjacent to, and admitting privileges at, WBMC, for inpatient treatment. During Daniel's stay at WBMC, his condition-diagnosed by Dr. Wilbanks as a viral infection and possible acetaminophen toxicity-allegedly improved; Daniel's fever resolved completely during that time and Daniel ate consistently, with no vomiting and normal urine output. Following a satisfactory physical examination and laboratory testings, Dr. Wilbanks discharged Daniel on September 22, 2009, without any accompanying prescription medication but with a follow-up appointment set for September 29, 2009.
Because, following his discharge from WBMC, Daniel allegedly slept little and continued to exhibit both irritability and fever, Armando and Eulalia took Daniel to see another pediatrician on September 23, 2009. During that visit, Daniel's pediatrician performed a "spinal-tap" test that was presumptively positive for the presence of bacterial meningitis. Daniel was immediately transported to WBMC's emergency room and was subsequently transferred to Children's Hospital in Birmingham, where he was treated with an antibiotic regimen and released on October 23, 2009, with the following "discharge diagnosis": "meningococcal meningitis, hydrocephalus status *44 post ventriculoperitoneal shunt placement, seizure disorder, blindness, and deafness as a result of bacterial meningitis."
In October 2011, Armando sued both WBMC and Dr. Wilbanks[2] in the Walker Circuit Court alleging a single count pursuant to Alabama's Medical Liability Act.[3] Following several amendments to his original complaint, Armando essentially alleged that Dr. Wilbanks had negligently, wantonly, and/or recklessly breached acceptable standards of care in providing treatment to Daniel during his stay at WBMC. More specifically, according to Armando, Dr. Wilbanks and WBMC failed to "timely and/or properly diagnose" and to promptly treat Daniel's bacterial meningitis and, as a result of those alleged failures, Daniel was left with, among other permanent physical injuries, visual and hearing impairment and a seizure disorder.
The complaint further alleged that, during his treatment of Daniel, Dr. Wilbanks was acting both as "a servant, agent, and/or employee of ... WBMC" and "within the line and scope of said employment and/or agency, so that ... WBMC [was] vicariously liable for the conduct of [Dr.] Wilbanks" based on the fact that WBMC allegedly "maintained a reserved right of control over ... [Dr.] Wilbanks." This allegation of WBMC's control specifically referenced "the Governing Board of the Baptist Health System, the Medical Executive Committee of [WBMC], and the Medical Staff of [WBMC]."
Following discovery, the trial court denied WBMC's motion seeking a summary judgment on Armando's vicarious-liability claims against it and denied a similar motion by Dr. Wilbanks on Armando's wantonness claim against him. Thereafter, the matter proceeded to a jury trial. On the first day of trial, Armando stipulated to the dismissal without prejudice of his claims against Dr. Wilbanks.
At the conclusion of the trial, Armando's claims against WBMC "based upon vicarious liability or respondeat superior" were presented for the jury's consideration. Ultimately, the jury returned a verdict finding that Dr. Wilbanks's actions did not meet the applicable standard of care, finding WBMC liable for the conduct of Dr. Wilbanks, and awarding Armando $10,000,000 in damages; the trial court entered judgment accordingly. WBMC filed a postjudgment motion seeking a judgment as a matter of law or a new trial. Among the other claims included in that motion, WBMC specifically asserted that it was entitled to a new trial based on the trial court's admission, over WBMC's objections, of evidence of prior medical-malpractice lawsuits filed against WBMC. Following the trial court's denial of its postjudgment motion, WBMC appealed.
Standard of Review
" ' " 'The standard applicable to a review of a trial court's rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence.' " Mock v. Allen, 783 So.2d 828, 835 (Ala. 2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala. 1998) ). Despite the latitude afforded the trial court in its evidentiary rulings, a trial court exceeds its discretion where it admits prejudicial evidence that has no probative *45 value. See Powell v. State, 796 So.2d 404, 419 (Ala. Crim. App. 1999), aff'd, 796 So.2d 434 (Ala. 2001).
" ' " 'The second principle "is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties." ' " Mock, 783 So.2d at 835 (quoting Wal-Mart Stores, 726 So.2d at 655, quoting in turn Atkins v. Lee, 603 So.2d 937, 941 (Ala. 1992) ). See also Ala. R. App. P. 45. "The burden of establishing that an erroneous ruling was prejudicial is on the appellant." Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala. 1991).'
" Middleton v. Lightfoot, 885 So.2d 111, 113-14 (Ala. 2003) (emphasis omitted)."
Wood v. Hayes, 104 So.3d 863, 870 (Ala. 2012).
Discussion
WBMC raises several challenges on appeal, including whether the trial court exceeded its discretion in allowing the jury to hear testimony of prior medical-malpractice actions brought against WBMC, in violation of § 6-5-551, Ala. Code 1975. This claim is dispositive.[4]
Section § 6-5-551 provides:
"In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care, or the hiring, training, supervision, retention, or termination of care givers, the [Alabama Medical Liability Act] shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts.... Any party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission."
(Emphasis added.) See also Ex parte Anderson, 789 So.2d 190, 195 (Ala. 2000) ("If all conditions of the statute are met, then any other acts or omissions of the defendant health-care provider are exempt from discovery, and the discovering party is prohibited from introducing evidence of them at trial.... Such exemptions would include information regarding any other incidents regarding [the defendant] and [its] alleged breach of the standard of care."). Stated generally, for purposes of this case, that Code section prohibits the admission into evidence at trial of acts or omissions by a health-care provider that are not related to the acts or omissions giving rise to the complaint.
Despite the clear language of the foregoing Code section and the broad nature of the privilege it provides, we note that this Court has recognized, in limited circumstances, an exception. Specifically, as demonstrated by this Court's holding in Crowne Investments, Inc. v. Reid, 740 So.2d 400 (Ala. 1999), the privilege found in § 6-5-551 can, in effect, be waived and the opposing party be entitled to introduce evidence of other acts or omissions if the defendant health-care provider "opened the door" to such information. 740 So.2d at 408. In Crowne, the defendant health-care provider's counsel asked the plaintiff's witness, *46 during cross-examination, about both her personal observations of the services rendered to the defendant's patients and her impression as to the quality of that care. On redirect, the plaintiff, without objection by the defendant, asked "a question regarding other acts," namely whether the witness had observed patients going unfed,[5] which the witness answered without objection by the defendant. 740 So.2d at 408. The defendant's subsequent objection to that line of questioning was deemed untimely, and the trial court permitted further questions regarding the defendant's treatment of other patients. On appeal, we rejected the defendant's claim that the trial court's admission of the other-acts testimony violated § 6-5-551. Instead, we explained that "[a] party who opens the door to an otherwise objectionable area of testimony cannot claim error when the opposing party introduces similar evidence." 740 So.2d at 408 (emphasis added).
The exception recognized in Crowne, which allows a party to counter the introduction of otherwise objectionable or inadmissible evidence by the introduction of comparable evidence, appears to be based to some degree on the doctrine of "curative admissibility":
" 'Curative Admissibility is a doctrine which holds that if a party introduces illegal evidence, his opponent has the unconditional right to rebut such evidence with other illegal evidence.' "
Kelley v. State, 405 So.2d 728, 730 (Ala. Crim. App. 1981) (quoting C. Gamble, McElroy's Alabama Evidence § 14.01 (3d ed. 1977)). However, that rule is limited.
" 'The rule is applicable even if the opponent failed to object to the original illegal or inadmissible evidence. A limitation upon this doctrine is the rule that the illegal rebuttal evidence may be admitted only to the extent that it cures the effect of the admission of the first illegal evidence. If, for example, a party introduces evidence of a hearsay conversation then his opponent has the right to introduce only so much of the remainder of the conversation as rebuts that portion first offered.'
"C. Gamble, McElroy's Alabama Evidence, Section 14.01 (3rd ed. 1977).
"The doctrine of curative admissibility is limited to the extent that it cures the effect of the admission of the first illegal evidence. Hall v. State, 375 So.2d 536 (Ala. Cr. App. 1979). 'Since the testimony of [the] victim's nephew was limited to that of deceased being a 'nice guy' to the nephew and helped people out and did things, any rebuttal or curative testimony would have to be restricted [to] showing that the victim was not a 'nice guy' and did not 'help out people and do things.' Since a crime of moral turpitude would do little to rebut such testimony, it would have been inappropriate for the judge to have let such unrelated prior acts in evidence."
405 So.2d at 730 (emphasis added). See also American Fire & Cas. Ins. Co. v. Bryan, 379 So.2d 605, 609 (Ala. Civ. App. 1979) ("The curative admissibility doctrine holds that if one party introduces illegal evidence, his opponent has the unconditional right to rebut such evidence.... However, this doctrine is subject to the *47 important qualification that matters not relevant to the issues on trial may not be brought out." (emphasis added) ).
With these principles in mind, we turn to the facts of the present case. The record reflects that during WBMC's cross-examination of Suzanne Pugh, WBMC's self-described "corporate representative" and "mouthpiece," WBMC's counsel, after confirming that Pugh had been employed by WBMC since 2004, engaged in the following exchange with Pugh:
"[WBMC's counsel]: Let me ask you this: You know what this claim is, this agency claim?
"[Pugh]: Yes.
"[WBMC's counsel]: Before you came into this courtroom and heard this claim, have you ever heard it proposed or ever heard of the notion before of a hospital somehow controlling or supervising the actions of independent physicians on staff?
"[Pugh]: No, I have never heard of that before."
(Emphasis added.) WBMC's counsel then proceeded to conclude his examination of Pugh with a few additional questions regarding Pugh's understanding of the independent nature of each physician's rendering of patient care at WBMC's hospital.
Immediately thereafter, Armando's counsel sought leave from the trial court to "ask ... a question" outside the jury's presence. The following colloquy ensued:
"[Armando's counsel]: That last question just opened the door so wide as to every other time [WBMC] has been sued for the actions of doctors. In fact, while she was an employee there, I sued [WBMC] for the conduct of [a doctor employed] in the emergency department and they paid money for those allegations, settled with me, and got out of the case.
"He's the one that opened the door. He said, have you ever even heard of this type of thing before, and she said no. And they have paid money for the same claim.
"[WBMC's counsel]: Judge, no door has been opened.
"THE COURT: Yes, it has.
"[WBMC's counsel]: I'm asking this witness in her role, what she does, if she's ever heard of-
"THE COURT: She's the mouthpiece for the hospital. That is who she is. She is the corporate mouth of the hospital and you asked if the hospital had ever heard of this before.
"[WBMC's counsel]: I asked this witness.
"THE COURT: Who is the mouthpiece of the hospital. She is the living embodiment of the hospital, she speaks for the hospital. When you asked her, you asked if the hospital ever had. You know, it went right by me but it certainly sounds like it just absolutely opened it up.
"[Armando's counsel]: Wide open.
"[WBMC's counsel]: It went by me as well, because I certainly don't know, Judge, of any law that says asking that question wipes Section 6-5-551 off the books.
"[Armando's cocounsel]: There is no way we can erase that. There is no way we can erase it. What he just got into evidence is this hospital has never been sued before.
"(Everyone talking at once.)
"[WBMC's counsel]: That was not the question.
"....
"[Armando's counsel]: My point being that he just asked her a question that opened the door to the fact that they have heard of this type of claim and that *48 they have paid on this very type of claim money to settle a lawsuit."
Noting the potential "new facet" raised by the foregoing discussion and the jurors' exhaustion, the trial court recessed the trial for the day.
When proceedings resumed the following morning, the discussion continued, with Armando's counsel providing authority to the trial court on the doctrine of curative admissibility. Essentially, Armando's position was that, in asking the above-quoted question of Pugh, WBMC "open[ed] the door to the multitude of other times that [WBMC has] not only defended but ... paid money on these claims for doctors somehow controll[ed] or being supervised by the hospital." Thus, Armando's counsel sought the trial court's permission to question Pugh on redirect examination on the issue and to "explore [WBMC's] knowledge on other allegations."
In disputing the broad implications assigned to his question by the trial court and Armando's counsel, WBMC's counsel explained: "She was only asked have you ever heard of the notion that independent physicians are controlled, other than in this case." In addition to denying that "the door [had] been opened," WBMC's counsel further argued that the prejudice that would be caused by any allegedly curative evidence "certainly outweighs any probative value...."
Following additional arguments as to the potentially confusing and prejudicial impact of evidence of other wrongs or omissions on WBMC's ability to obtain a fair trial, Armando's counsel replied:
"And what they did was is they told the jury through ... Pugh that we've never even-[WBMC] has never even ever heard of this before. And I can tell you that that is far from the truth, far, far, far from the truth. And that statement that [WBMC] hasn't even ever heard of this or heard of the notion of this before has been opened completely wide-the door has been opened completely wide open, and the plaintiff should be able, according to Alabama law, to explore the defendants' knowledge relating to vicarious liability claims made in other cases."
The trial court denied a renewed request by WBMC's counsel to review the assembled evidence at a hearing before it was presented to the jury; the trial court instead ordered that "[WBMC would] have the opportunity to object as the testimony is coming in." In response to renewed complaints by WBMC's counsel that such evidence "violates [§] 6-5-551" and a specific request for a standing objection for purposes of appeal, the trial court agreed to "give [WBMC] a standing objection before [we] start" as well as the opportunity to lodge further and more particularized objections to particular items of evidence when they were introduced.
When proceedings resumed, Armando's counsel informed the trial court that he had, through the use of "the Alabama Court system website," identified "10 or 11" complaints that he would like to address in the following proposed manner:
"[W]hat we intend to do is to go into the fact that there was a lawsuit that was filed and that the allegation was that the doctor-the doctor's negligence was the responsibility of the hospital due to a vicarious liability claim, an agency claim, a claim that they controlled the conduct of the doctor during his performance of these actions and that they were represented by [WBMC's present counsel] in that case.
"We do not intend to go into the results of the case, settlement negotiations of the case, whether it was a defense verdict or a plaintiff's verdict or any *49 amounts of money that they paid in specific references to these cases. We intend to limit them very narrowly in order to be as careful as we can in response to the Court's ruling that the door has been opened...."
As explained by Armando's counsel, the approach was based on "[t]he fact [that] the knowledge of ... [WBMC] was put into evidence ... through the specific question asked by [WBMC's counsel] and responded to by ... Pugh," which, he indicated, was "all [he] intend[ed] to explore."
In response, WBMC both provided authority for the proposition that and argued that the trial court should instead "allow the jury to take the interpretation of th[e] question ... to be ... under the setting of the ... standards, under the setting of Medicare rules and regulations and conditions of participation [asked about by Armando's counsel during direct examination of Pugh] ... as opposed to other litigation" and the exploration, in that context, of whether "through those very same documents ... the hospital did control the acts of a physician." WBMC further argued that, given the possible alternate interpretations of the disputed question, the legal, permissible interpretation should prevail.
The trial court rejected that notion and instead explained its belief that the answer WBMC solicited from Pugh suggested that the theory of liability advanced by Armando was "an absurd proposition... [that has] never been put out before" and that "this is a frivolous lawsuit." It therefore found, based on its application of the doctrine of curative admissibility, that the question and Pugh's answer opened the door to Armando's introduction of other lawsuits involving claims asserted against WBMC based on allegations that WBMC was liable "for the conduct of a physician working at the hospital based upon the theory of vicarious liability [or] if the physician is alleged to be an agent or employee of the hospital." The trial court did, however, prohibit evidence from both parties related either to the ultimate disposition of any such claim or lawsuit introduced by Armando's counsel or to the merits of the included claims.
Before the resumption of Pugh's testimony, the trial court again granted WBMC a continuing objection to the admission of each instance of other-claims evidence; Armando's counsel conceded to the continuing objection on the trial court's curative-admissibility ruling. Thereafter, in his redirect examination of Pugh, Armando's counsel obtained Pugh's confirmation that she was WBMC's corporate representative on the issues of physician relations, compliance with conditions of the Medicare and Medicaid programs, accreditation and certification, and WBMC's supervision and control over physician's actions. Thereafter, Armando's counsel read back the disputed question and Pugh's response, as set out above; Pugh confirmed that she had, in fact, given the response and again denied personal knowledge of specific details of other claims and/or litigation while conceding that someone at WBMC who, in fact, handled such claims likely had such knowledge. To purportedly counter Pugh's denial, Armando's counsel then proceeded with a slide presentation during which he provided the following accompanying narration of slides evidencing numerous prior claims and/or suits against WBMC:
• "Let's take a look at the lawsuit that was filed in 2007 relating to Ms. [L.H.]. Was [WBMC] aware in 2007 that [Ms. H.'s] left arm and left leg were paralyzed following a surgery at [WBMC], and that Ms. [H.] filed a lawsuit claiming that the doctor who did the surgery was negligent by leaving a four-inch catheter in her *50 body, causing her paralysis, and Ms. [H.] claimed that [WBMC] was responsible for that surgeon's negligence; were you aware of that?"
• "Let's take a look at lawsuit involving Ms. [B.S.]. Allegedly in that case, [P.S.] died from a digoxin toxicity, Coumadin toxicity, and renal failure at [WBMC], and her family on her behalf sued [WBMC] claiming the hospital was responsible for the doctor's conduct and the doctor's medication error and claimed that the hospital was responsible for his conduct because they reserve the right to control his actions."
• "In 2008, [D.C.F.] ... filed a lawsuit on behalf of [S.M.] who died ... in ... the [WBMC] emergency department. In that lawsuit her family sued [WBMC] claiming it was responsible for the emergency room doctor negligently failing to timely administer insulin despite evidence it was needed."
• "[I]n 2008 ... [T.H.] was born with a brain injury -allegedly, [T.H.], a baby, was born with a brain injury at [WBMC]. [T.'s] family on his behalf sued [WBMC] claiming it was responsible for the doctor negligently failing to monitor the mother and the child during childbirth, specifically failing to recognize that the mother had a placental abruption and that the child suffered a significant brain injury in that case."
• "In 2013, [J.R.P.], a 42-year-old man, died from a staph infection several days after he sought treatment at [WBMC's] [emergency room], and his family filed a lawsuit. His family sued [WBMC] and claimed it was responsible ... for the ER doctor's negligence in failing to catch that staph infection."
• "In 2014, there was an eight-year-old little boy that died from undiagnosed and untreated pneumonia after being sent home from [WBMC] with a probable virus. In that case, the family sued [WBMC] claiming the hospital was responsible for the doctor's conduct and negligence in failing to treat the bacterial pneumonia."
• "In 2015, a case that's been widely publicized, allegedly a 16-year-old boy who was released from the emergency room department despite displaying homicidal and suicidal tendencies and his parents requesting him be admitted to a psychiatric facility. The complaint goes on to allege that they had the absolute right to require him to be kept because of their fear. He was released from the ER and allegedly he stabbed and killed his mother that night. In the complaint they describe how [WBMC] should have taken different action. The family sued [WBMC] alleging the hospital was responsible for the negligence of its ER doctor because it controlled and monitored and supervised that ER doctor."
• "In 2007 a lawsuit was filed, allegedly a cerebral palsy patient had made multiple trips to the [WBMC] emergency room claiming that he couldn't feel his hands or feet after a fall at home. He became a quadriplegic due to an undiagnosed spine injury. In that case, Mr. [F.] sued [WBMC] alleging that it was responsible for the emergency room doctor's negligence in failing to perform tests on Mr. [F.]."
• "In 2006 allegedly, according to the complaint, [A.B.]'s unborn child died at [WBMC] during childbirth. Ms. [B.] sued [WBMC] claiming the hospital was responsible for the doctor *51 negligently failing to perform tests to rule out placental abruption."
• "...[I]n 2006 a lawsuit was filed that alleged that Ms. [W.] was left without use of her left hand after surgery at [WBMC]. In Ms. [W.]'s suit, [she] claim[ed] [WBMC] ... was responsible for the orthopedic surgeon negligently damaging the nerves, arteries, and veins of the arm during surgery."
As to each of the above instances, Pugh denied personal knowledge of the specific claims, but conceded that either WBMC or a representative of WBMC was likely aware of the facts and circumstances of each case.
WBMC's brief to this Court-and those filed by numerous amici curiae-evidence a belief that, in prosecuting his claims against WBMC, Armando was, at least in part, attempting to pursue some new and different theory of vicarious medical liability, namely the imposition of a duty based on WBMC's participation in the federal Medicare and Medicaid programs and its compliance with the conditions of participation. It appears that this belief is what likely spurred the question to Pugh. It also appears that the question to Pugh by WBMC's counsel and her resulting answer was not a categorical denial of the existence of any past claims against WBMC on the theory of vicarious liability that actually "opened the door" to the introduction of evidence of any and all such claims. In fact, we question whether the information solicited from Pugh by WBMC's counsel was either objectionable or illegal; instead, it appears, at most, to have been, in the eyes of Armando's counsel, a purposeful untruth that would have exposed Pugh-and through her, WBMC-to potential impeachment. Therefore, the trial court could have, within the bounds of its discretion, decided that the door had been opened to allow the jury to hear of past vicarious-liability cases.
In any event, the extent to which it opened any door is nonetheless limited. Specifically, we find that Pugh's answer would have opened a door only to the extent of knowledge of the existence of prior lawsuits against WBMC where agency was at issue-not the additional facts from which any prior claims of vicarious liability stemmed. See Kelley v. State, and American Fire & Cas., supra. Despite representations by Armando's counsel that he intended "to introduce contradictory evidence in a limited and narrowly tailored fashion to prove that the hospital was aware that there were other allegations and other lawsuits [alleging] ... that the hospital was responsible for the conduct of its doctors through an agency theory through the reserved right of control allegation," the record does not indicate that the "contradictory evidence" Armando offered was so "limited and narrowly tailored." Instead, as demonstrated by the above quotations from the record, Armando's counsel did not limit his presentation of curative evidence solely to demonstrate WBMC's knowledge of the mere existence of such claims. To the contrary, the record clearly reflects that he used the opportunity to also introduce the damning, inflammatory facts and horrific injuries in each of those prior cases. Those factual recitations were, as WBMC argues, undeniably prejudicial. As demonstrated by the above caselaw, the doctrine of curative admissibility is a very narrow doctrine. The additional information disclosed to jurors by Armando's counsel regarding the injuries suffered by patients or the alleged prior misdeeds of WBMC lacked any probative value as to the issue for which they were ostensibly offered-WBMC's and/or Pugh's knowledge of lawsuits against WBMC based on a theory of vicarious *52 liability-and their admission was error as a matter of law. See Wood, supra. As WBMC argues, the evidence of serious injury and death suffered by former patients of WBMC "served only to prejudice the jury by suggesting not only that WBMC is routinely held liable for the acts of its staff physicians but also that patients are routinely injured at [WBMC]." WBMC's brief at p. 62 (emphasis added). We note, too, that the alleged "curative evidence" also failed to establish that the disclosed prior claims were based on the specific theory of agency liability alleged in this case.
Armando's counsel was allowed to present to the jury exactly the type of evidence prohibited by § 6-5-551. Likewise, such overwhelming prejudice could not have been ameliorated by a single reference, during the trial court's jury instruction approximately two weeks after the above-described testimony, directing jurors to "consider that evidence ... only ... as it relates to [WBMC's] knowledge or awareness of other claims that have been asserted against [WBMC] alleging that the hospital was or is responsible for the conduct of physicians who were providing medical services at the hospital."[6] As Justice Lyons observed, "[t]he breadth of th[e] prohibition [in § 6-5-551 condemning the introduction of extraneous evidence at trial] is ill-suited to avoid its violation by a limiting instruction given after introduction of the condemned evidence." Ex parte Brookwood Med. Ctr., 994 So.2d 264, 269 (Ala. 2008) (Lyons, J., concurring specially). This principle is especially true here, given both the volume and the nature of the other-act evidence offered by Armando, which specifically included evidence of multiple emergency-room-related claims and one remarkably similar incident regarding treatment of a minor child.
Conclusion
In light of the foregoing, this Court concludes that the facts related to the jury regarding prior acts and omissions by WBMC were entirely irrelevant for the purpose of curative admissibility, were highly prejudicial to WBMC, and warrant reversal of the judgment against WBMC. The judgment of the trial court is, therefore, reversed, and the cause is remanded for a new trial.
REVERSED AND REMANDED.
Stuart, C.J., and Bolin, Parker, Main, Wise, Bryan, Sellers, and Mendheim, JJ., concur.

We note that the record on appeal includes alternate spellings of Armando Cantu's first name. For purposes of this opinion, we have opted to use "Armando," the spelling included in Armando's sworn interrogatory responses, the records associated with Daniel's treatment at WBMC, and on Daniel's birth certificate.

Other defendants were named in the complaint. They were, however, either subsequently dismissed or determined by the jury not to have breached any applicable standard of care.

See § 6-5-480 et seq. and § 6-5-540 et seq., Ala. Code 1975.

We express no opinion on the merits of the other issues raised by WBMC in this appeal.

In Crowne, the basis of the plaintiff's claim was that the defendant had "negligently caused or allowed [a patient] to be fed by his wife, who was not medically trained to feed someone in [the patient's] condition," and "that this negligence caused [the patient] to suffer an asphyxiation event and that he died as a proximate consequence of this negligence." 740 So.2d at 402.

As WBMC points out to this Court, it objected to the proposed charge on grounds that it failed to "cure[ ] the error that has been allowed by introducing those other lawsuits" because, WBMC alleged, Armando's counsel allegedly "went outside the [trial court's] order by providing information that was beyond the scope of what the Court allowed."